[No. 14891.    Department One.    November 27, 1918.]

*In the Matter of the Proceedings for the Disbarment of* EDGAR G. MILLS.[1]

ATTORNEY AND CLIENT (7-1)—DISBARMENT — GROUNDS — CRIMINAL OFFENSES—BLACKMAIL. An attorney of mature years and long experience should be disbarred where it appears that, having been fully informed of, and having given advice as to, a blackmail scheme, he assisted therein by delivering the blackmailing message, having knowledge, or ample means of reading and acquiring knowledge, of its contents before delivery.

THREATS — BLACKMAIL — ACTS CONSTITUTING — ACCESSORIES. An attorney who advises as to and delivers papers intended to extort a settlement of a dispute and the purchase of stock through accusations of crime and threats of publication of alleged events and incidents of the recipient's life, having knowledge or reasonable grounds of belief as to, and full opportunity to ascertain, its contents before delivery, is guilty of blackmail, under Rem. Code, § 2613, including within the definition of blackmail an accusation of crime with intent to extort or gain any money or property or affect any cause of action or defense, and Id., § 2007, abolishing the distinction between an accessory before the fact and a principal and making aiders and abettors liable as principals.

Proceeding filed in the supreme court June 18, 1918, for the suspension of an attorney, upon findings of the state board of law examiners. Judgment of disbarment.

*The Attorney General* and *R. M. Burgunder, Assistant,* for the state, contended, among other things,

[1] Reported in 176 Pac. 556.

that a conviction of the offense of blackmail or of attempted extortion by threats is a conviction of a crime involving moral turpitude. *In re Hopkins,* 54 Wash. 569, 103 Pac. 805; *In re Coffey,* 123 Cal. 522, 56 Pac. 448; *People ex rel. Colorado Bar Ass'n v. Varnum,* 28 Colo. 349, 64 Pac. 202; *People v. Eichler,* 75 Hun. 26, 26 N. Y. Supp. 998; *Ex parte Mason,* 29 Ore. 18, 43 Pac. 651, 54 Am. St. 772; *In re Sherin,* 27 S. D. 232, 130 N. W. 761, Ann. Cas. 1913D 446; *In re Harrington,* 146 App. Div. 219, 130 N. Y. Supp. 920.

*Edgar G. Mills,* in person (*Charles E. Claypool* and *C. J. France,* of counsel), for accused.

TOLMAN, J.—On January 23, 1918, a complaint was filed with the secretary of the state board of law examiners charging Edgar G. Mills, a duly admitted attorney under the laws of this state, with unprofessional conduct as a member of the bar of this court, because of his action in connection with a certain attempt at blackmail.

It appears that one F. J. Richards, who had long been employed as the manager of the Thompson Hotel Company of Lincoln, Nebraska, had acquired certain stock in that company, partly paid for, upon his interest in which he fixed a value of $24,000. Mr. Thompson was the holder of a majority of the stock of the hotel company, and there appears to have been no market value for the minority stock. Mr. Richards, evidently desiring to sever his connection with the hotel company in order to take employment as business manager with one Dr. Dechmann, who operated a sanitarium on Lake Crescent, in Clallam county, this state, desired to dispose of his stock in the hotel company at what he considered its value, and conceived the idea that he could not do so to any

one other than Mr. Thompson. At the same time, Dr. Dechmann was having trouble with Mr. Thompson over certain water rights. Thompson had previously been a patient at Dechmann's sanitarium and taken treatment there. For a time he expressed himself as pleased with the treatment, and then appearing to become dissatisfied, left the sanitarium and went to his summer home adjacent, and laid claim to the water, which seems to have flowed through his property, which was used to supply the Dechmann sanitarium. Litigation arose over the water right between Dechmann and Thompson, and Mr. Mills was attorney for Dr. Dechmann in that litigation. Richards was interested in this litigation and in Thompson's attitude toward Dr. Dechmann and his sanitarium because of his plan of allying himself with Dr. Dechmann's interests, and he desired to settle the controversy over the water right in Dr. Dechmann's favor by obtaining a ninety-nine year lease of the Thompson property, and obtain a statement from Thompson with reference to Dr. Dechmann's ability and method of treating diseases, which would be of value in the future to both Dr. Dechmann and himself. Under these conditions, Mr. Mills proposed to Dr. Dechmann that he would go to Thompson, over the head of Thompson's attorney, and try to settle the dispute over the water right, and Dechmann advised him to wait a while as Richards had some plan for adjusting matters, and it would be well to consider that plan before anything else was done. The other material facts will hereafter appear.

The constitutional questions raised by the defendant are disposed of against his contentions in *In re Bruen*, 102 Wash. 472, 172 Pac. 1152, and need not be here considered. The other technical objections

and motions made by the defendant have been carefully considered, found not well taken, and, because of the length of this opinion, will not be further discussed.

The defendant in his brief says:

"You cannot convict or disbar unless it is shown that the acts were knowingly done, and the evidence is undisputed that Mills did not know the contents of the package and there is no finding that he did, and no evidence to that effect and no ground for an impartial mind to so conclude."

We quite agree with and adopt the legal conclusion that the acts must be shown to have been knowingly done in order to justify disbarment; but as to the evidence, we are reluctantly forced to take the opposite view. There was introduced in evidence two written statements, each signed by Edgar G. Mills (Exhibits 4 and 5), purporting to cover the facts in this case; and according to the testimony, each of such exhibits was carefully read and corrected by Mr. Mills before he affixed his signature. Exhibit 4 was made at the time of the institution of a criminal prosecution for blackmail against Richards, Dechmann and Mills, and exhibit 5 was made some months later after Richards and Dechmann had been tried on the charge and Mr. Mills had testified in both trials as to the facts within his knowledge. The two statements do not differ in effect, though exhibit 5 goes more into detail; and while it may unduly extend this opinion, yet to avoid the possibility of its being thought or said that any evidence has been torn from its context to alter or affect its convincing force, we feel obliged to quote exhibit 5 in full, which is as follows:

"In the Superior Court of the State of Washington
　　"in and for the County of Clallam.

| | | |
|---|---|---|
| "State of Washington,<br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>"Frank J. Richards and<br>"Louis Dechmann,<br>　　　　Defendant. | } | Statement of<br>Edgar G. Mills. |

"November 23rd, 1916, by Mr. S. C. Rose:

"Q. Now, then, Mr. Mills if you will say—along the same line as your testimony in this proceeding of the state against Dechmann—when was the first conversation that you had with Dr. Dechmann that had anything to do with this Richards proposition? A. On or about the first part of June, 1916. Q. Then what was that? A. That was when I told the doctor that I was going to try and go over Trumbull's head and get a hold of Thompson and see if we could not settle up this water dispute and the doctor then said to me, 'Wait a while, Richards has some plan, let us see what that is and what he can do before you do anything.' Q. Did he say what the plan that Richards had would be calculated to do, or what Richards thought it would do, or what it would settle up? A. He said that Richards had some plan that he thought he could settle up everything. I then wrote Richards a letter about the Burkhardt title, and in that was a short paragraph in which I said the doctor said to me that you have said to him that you have some plan whereby you expect to effect a settlement of all of the doctor's trouble with Thompson. I said that conditions were getting into a bad shape as far as the doctor was concerned, that I had to make frequent trips to Port Angeles and Lake Crescent and that they were expensive and that something drastic would have to be done soon. I think I got a reply to that, I am not sure about it though, that he was going to be in Seattle before long; he made no reference to any plan, but that was the answer to that letter. He did answer in regard to the Burkhardt title. Q. Had you met Richards up to this time?

A. No, I had not. Q. Then what next was in connection with this thing? A. The next was when I was introduced to Richards at the Woman's Exchange in Seattle. Q. Tell us about that. A. I was at the woman's exchange, either 'attending some political meeting or getting my dinner, I think perhaps both— Q. About what date was that? A. That was the Saturday or Sunday, I do not remember which, if it was Saturday, it was the Saturday of the second week before the 20th of July. If it was Sunday, it was the week preceding the week including the 20th, anyway, Mr. and Mrs. Dechmann were there with Richards and two or three others who were strangers to me, I think Germans also, and I was introduced to Richards. Q. Is it true, as you have said before, that Dechmann first called you to one side? A. I was just getting to that. Q. Were you introduced to Richards first before Dechmann called you to one side? A. I was introduced to Richards at the table and shook hands with him. I had heard about him in 1915, because my older boy was at Lake Crescent, at Qui Si Sana, the same time as Richards was there. Q. And then what? A. Well, then, after I was introduced to Richards and they finished their dinner, the doctor called me to the other side to one of the side seats (they are arranged like Pullman tables) and said that Richards wanted a lawyer and that he wanted to throw the business to me so that I would get the fee, and said, 'He has some kind of statement that he wants to give Thompson,' and that they wanted me to blue-pencil it, and then he called Richards over. Q. Did he state to you why it should be blue penciled? A. The idea that I got was that he wanted it brought within the law of Blackmail. Q. Did he use the term of Blackmail? A. I think he did. I am sure about the blue penciling. Q. Are you sure he said blackmail or not? A. The word blackmail was used, I am sure that Richards used the word blackmail. Q. Did Dechmann use it before Richards was called over? A. I think he did. My recollection is that he did, I am sure that Richards did. Q. Was Dechmann there? A. Yes, Dechmann sat right there. The doctor sat over against the wall,

then Richards on the outside of the same seat, and I sat on the other side of the table. Richards wanted the laws of blackmail looked up under the laws of the state of Washington, the conversation was short there. Well, then, I went to work in my office Monday, Tuesday, Wednesday, Thursday, until Friday afternoon, looking up the law of blackmail as suggested by Richards, and I not only looked it up in regard to the laws of the state of Washington, but I went into the Encyclopedia of Law.

"Q. Did Dechmann, prior to the time that he called Richards into your conversation, did he before say to you in Richards' absence, while Richards was away, that Richards wanted you to look up the law of blackmail? A. My recollection is that he said that Richards was going to get up a statement and wanted me to blue-pencil it and bring it within the law of blackmail. Q. Then you were up to the point where you had looked up the law during several days—— A. Well, during the morning the doctor telephoned down and made an appointment for Friday of that week at 3 o'clock. I remember that because it is on a calendar that I have in my office. Q. That is, Doctor Dechmann called you up? A. Yes, and they came into my small office there. Q. By they you mean Richards and Dechmann? A. Yes, Richards was sitting right there at the end of my desk and Dechmann over at the corner by the bookcases. Richards had with him the eight or nine pages of typewritten stuff that is now incorporated in state's Exhibit A. Q. That was the first eight or nine pages, was it? A. Yes, now he may have rewrote it, but it is practically the same, I think probably verbatim. He had another paper, his 'Bully of Natches,' and he went on to tell how he was going to match that up with the Bully of Nebraska or Lincoln. Q. Did he make a statement of what he proposed to allege or say in his so-called Bully of Nebraska, that is, did he make a statement of what he was going to say about Thompson? A. He stated in detail just as I stated on the stand concerning the allegation of stealing his transportation coming from Michigan to Nebraska, and the lantern incident of beating the young

man, and then he took up the alleged history of Thompson's three marriages, and stated in regard to the difficulty in the apartment house at Lincoln, and involving the question of the impotency of Thompson with his third wife. Q. Have you since read this stuff, I mean any time since, the last few days, or at any time since, have you read the stuff that is in this Exhibit A? A. I heard it read by Mr. Trumbull and Mr. Rose. Q. Now, did he in substance state to you there in your consultation office what is incorporated in that Exhibit A under the heading of the 'Bully of Nebraska?' A. He told about the difficulty between Thompson and Dechmann and his complaints, and of the visit of the people from Nebraska, and the accusations of infidelity on the part of his third wife, and also took up the question of the present son of Thompson, resemblance to Thompson, vindicating the woman. I do not think that there was anything said about the alleged persecution of the kid. Q. Did he speak of this distribution of passes on the basis of the wives and daughters submitting to his sensual desires? A. Yes. Q. Did he take up the Central Bank of Lincoln, Nebraska? Did he say anything about that? A. Yes, I will tell you why I remember that. I have a client who met me on the street car, who said, 'I have a decision here that would be of interest to you,' and he handed me a typewritten decision of the United States Supreme Court that had been sent to him by an attorney named Jones in Nebraska, who had acted on the other side of this bank business? Q. That is this suit that involved Thompson? A. Yes, and I asked him to let me take it, and I took it up and showed it to Dechmann. This was before the 20th of July. Q. Was it before you had met Richards? A. Yes, it was before I ever met Richards. Q. Then the alleged blackmail of Occult and Mosier, did he mention that? A. Yes, these were propositions that he proposed to put in. He was discussing using them. Q. And that would be the case if he used them? A. Yes, and that was the dope that he was figuring on using. Q. Well, then, this allegation referring to the seduction of the girl in Brazil? A. Yes, he had the thing down from A to Z,

as he has it in Exhibit A. Q. Well, at the time he was discussing making these statements, and you and he were considering the thing, and he submitted these eight or nine sheets to you, was Dr. Dechmann present all the time? A. He was in and out. Q. Would you say that he was there most of the time? A. I should think a good deal of the time, what he did out I do not know, but as I testified, I telephoned to him that I wanted to talk to him before I talked with Richards, but he did not do that. Q. Then, if I understand you right, first Dechmann phoned you and made the appointment, and a little later you phoned Dechmann and asked him to come down first so that you could see him before you talked with Richards? A. Yes, but when he did come on Friday, Richards was with him. Q. Then he did not come alone; he came with Richards? A. No, he came with Richards. A little later, I think this was before I entered into the conversation with Richards, I called him out and said that I wanted him to keep out of it; he did not say anything, but he gave me one of those knowing looks and nods, as though he was on. Q. Then did he come back into the office with you? A. Yes, and was in and out, most of the time he was in there. Q. Did he make any remark that indicated that he heard what Richards was saying? A. As I recall, the only remark he made—he was horrified that some of the things that Richards alleged against Thompson having been done.

"Q. Now, what advice, if any, did you give them as to this proposition? A. I read them first the statute on the law of blackmail, and also read them the statute on the law of extortion, comparing the difference between the two, and I read a lot of decisions I had, just what ones I do not remember, my desk was piled up a couple of feet deep, that is my way of briefing a case as I find one case I lay it open on my desk. Q. So that you have just kind of an endless chain? A. Yes, I never finish a brief. I told them that the law of blackmail under our statutes was very strict, and that to put up the accusations, or in brief, the article that he had suggested, as a sort of history of Thompson's life, accompanied with threats, would be blackmail.

Here is something further that I said to him. I said,
'Is this the first difference you have had with Thompson?' And he said it was, he said it was the first suggestion that he ever intended to quit Thompson; and
I said, 'It is just like a stroke of lightning;' and he
said it would be; and I said, 'Now here is a man who
has been ambassador to Brazil, ambassador to Mexico,
president of a railway, a multi-millionaire, a man full
of experience,' and I said, 'Have you any idea that
you could pull off anything like you suggest and get
away with it?' and he said, 'I think I know my man.'
Q. Was it at that time that you started to prepare
the form of lease that is Exhibit F? A. Yes, that
lease was started to be prepared. They came late and
we talked a long while, and the girl had gone, and I
was not used to using the machine, and I got it all
balled up, so we drew it up again the next day. Q.
Where did you get the description? A. From my files
on the water case. Q. Did Dechmann know that you
were drawing up that lease? A. Yes, he knew that.
Q. Did he know the purpose of it? A. I do not know.
I advised them against the threats, and when they left
there there was no decision made and I thought he
would follow my advice, if he wouldn't, what did he
get it for; but as things look now, he never intended to
follow it. Q. Did you at that time, as insinuated by
Mr. Israel, advise them to the effect that if a man
makes threats in order to obtain something that he
honestly believes is rightfully his, that it would not
amount to blackmail? A. If I did it came through
some authority that I read. I know I would not advise him of that. But after he testified that I told him
that, I testified that probably I did read it, but my
impression was that he had been advised on the law
of blackmail in Nebraska, and wanted me to look up
especially the law of blackmail in Washington. Q. But
you have no recollection of advising him as to his obtaining a thing rightfully his? A. No, in the first
place, a thing of that kind would be inapplicable to
the thing that he presented to me, because there was
so many of them that were entirely foreign to any demands that he might make on Thompson or any busi-

ness connection with Thompson. Q. Did he then outline the things that he proposed to demand, that is the $24,000 for his stock as set forth in this Exhibit A and the 99-year lease, and the letter that follows? A. The stock, of course, was mentioned in the pages that was submitted to me. Q. I guess all of those things were outlined in those pages, the three demands; if you had those nine pages you had them all. Now, Mr. Mills, I hand you this copy which I have of Exhibit A and ask you if, as a matter of fact, those three demands there set up in those first nine pages were in those submitted to you, or, that is, if they are in substance what was submitted to you? A. Yes, these are in substance the same nine pages that I saw. Q. And those three demands were in your mind as a part of their purpose when you advised them? A. Yes, it was those that I told them that if connected with threats that he suggested, Thompson's biography, as he called it, would constitute blackmail. Q. Then in drawing up this lease you were drawing the lease in accordance with the second demand? A. At the same time they were considering these he asked me to draw up a lease and I took the description from the files I had in the water suit of Thompson v. Dechmann. Q. Then that form of lease that you started to draw was a lease of the Thompson property on Lake Crescent? A. Yes. Q. Then when after that meeting did you next see Dechmann and Richards? A. I saw Richards the next morning; some time in the forenoon he came in and had the stenographer draw up the lease. Q. Were you present? A. Yes, I was present. Q. And supervised the drawing up of the lease? A. I just simply gave her the interlined and balled up copy that I had drawn up the day before, and she drew it up and put it on my desk. Q. Did you have any conversation at that time with him, this time when your stenographer made out the lease, did you have any conversation with Richards as to this general proposition? A. Nothing at all; he simply got the lease and went away.

"Q. When was the next time that you met either Richards or Dechmann? A. The next Sunday night

at the Butler hotel.  Q. Just tell us how you happened to meet and what occurred?  A. I told Richards that I was going to Port Angeles on the Burkhardt title. Q. When did you tell Richards that?  A. I think I told him that on Friday the——  Q. The day the lease was made or the day that you had this general consultation?  A. Friday was the day that I had the general consultation with them; the lease was started that day. Q. Now, will you answer again, Mr. Mills, the question that I asked you as to when it was that you told Richards that you were going over to Port Angeles on the Burkhardt title?  A. That was on Friday, the first and only consultation that I had on this matter.  Q. Well, just proceed.  A. I told him also that Tuesday was the day set to take up the injunction suit that Dechmann had brought to restrain Thompson and Trumbull from blowing up the dam, and it was agreed that I should meet them at the Butler hotel on Sunday evening at about 10 o'clock, as he was going to Portland that same night that I was going to Port Angeles.  Q. When you told them on that Friday of this consultation that you were going to Port Angeles and the appointment was made, then was there any express purpose in having that meeting?  A. No, that was just incidental, that we were both going away about the same time.  The only talk about the delivery of the papers to Thompson occurred there at the Butler hotel.  It was very brief and hurriedly, as we had not touched on that until after we had gotten well along with a hasty meal.  He had called me up and paged me at the hotel that the automobile was broken down and that they would be delayed, and they did not get there until nearly 11 o'clock (my recollection is that it was nearer to half past 11 than it was 11), and the meal that we had was light stuff to correspond with the time we had to eat it, and Richards and I did not get half way through with what we were eating until we had to go to the train and the boat.  Q. You say they came—who came?  A. Richards and Dechmann and Mrs. Dechmann and Miss Schuetz.  Q. Did you sit at the same table?  A. Yes, at the same table.

10—104 WASH.

Q. And what conversation took place there with regard to this document? A. No conversation about the document, except Miss Schuetz said how hard she had been working all day Sunday and Sunday night and that she just got the papers concluded before they started, and how tired she was, and then the next conversation was just a minute before we started to go away, and the doctor suggested that Hans might deliver the papers, and I said that I did not want any of the Dechmanns to have anything to do with this because if I ever do have a settlement with Thompson this might aggravate it. Then I got up, and the papers, the two packages, were handed to me. I had my grip in one hand and my coat in the other hand.. Q. What did you say, if anything, as to your doing it? A. Will you wait? I reached over and the packages were handed to me. Q. By whom, if you remember? A. My recollection is by Richards. I said, 'Now I do not know what is in this, and I do not want to know, and I won't know. I am simply going to act as a messenger boy, and if I cannot arrange conveniently to have some one deliver them at the time Richards wants them, I will see to it that they are delivered myself.' Q. How were these two packages marked? A. One was marked 'Hon. D. E. Thompson, Lake Crescent, Washington,' on the outside wrapper. I know that there were two wrappers, because the outside wrapper became untied, it was tied with a string, and I saw that there was a lighter paper wrapper, and my recollection is that the other one was done up in the same way and marked with a lead pencil, either 'Doctor D.' or 'Dr. Dechmann,' as to what I was to do with the extra copy there was nothing said, as I had to rush to catch the boat, and just got on as the gang plank was drawn up. Q. Richards told me yesterday—and I just want to ask you if it is true—that you asked for the second copy because you wanted to read it, and that Dr. Dechmann's copy was given to you to read? A. He testified on the stand that he gave me this copy marked 'Dr. Dechmann' to read over by me before I served the paper; there was nothing of that kind said, and there was absolutely no strings at

all upon the delivery of the package to Thompson, because if I had ever read it I would not have delivered it, and he wanted it delivered at a certain hour on a certain day, as that would be about the same time that he would arrive in Lincoln, and if I had ever read it over I would not have delivered it, and that would have balled him up. Q. Were you given any instructions as to notifying Richards when you had made the delivery? A. Richards asked me that as soon as I delivered it to Mr. Thompson, to wire him, which I did.

"Q. Now, was all of this conversation that you have just spoken of between you and Richards, touching the delivery of the package to Thompson and the wiring to Richards, in the presence and hearing of Dechmann? A. It was in the presence and hearing of Dechmann, Mrs. Dechmann and Miss Schuetz and myself. Q. Was it all while you were grouped about the table? A. Yes, when we left the table he went one way to the train and I the other to the boat. Q. That is, he went to the train and you to the boat? A. Yes. Q. Then did you deliver the package to Thompson? A. I did. I went to Thompson's wharf on the morning of the 20th of July. I told Hans to get out his launch. Q. Where were you stopping? A. At Qui Si Sana. I had been there a couple of days, and inspected the spring and waterworks and interviewed some witnesses in regard to the community interests of the Burkhardts and the injunction suit against Thompson and Trumbull. Q. Who else, if any, of the Dechmanns were at Qui Si Sana at any time during the couple of days that you say you were there? A. A married daughter, Mrs. Abernethy, with her two children and the other two girls and the three boys. Q. Including, of course, Hans, of whom you have spoken? A. Yes. Q. Then Hans drove the launch over to the Thompson dock? A. Yes, we swung around and I threw the package over on the wharf. Thompson was there carrying his boy, and I said, 'Here is a package that Richards wanted me to deliver to you personally.' He invited me to come in and asked me if I would not like to look over the grounds, and I told him that I might come back later in the

day, and then I went down and wired to Richards at Lincoln, Nebraska, 'Papers delivered personally to Thompson, at 9 o'clock this morning at Lake Crescent,' and signed it. Q. Now, when you say that you wired and signed it you mean that you telephoned this in? A. Yes, I telephoned from Qui Si Sana to Fairholm, and asked the operator to get that wire off and he said that he would do the best he could. Q. Do you understand that there is a telegraph office there, or that he was to relay it by telephone? A. I understood that he was to relay it by phone. Q. Then you came back to Seattle with this copy of Dr. Dechmann's in your possession? A. Yes. Q. Then what did you do with Dr. Dechmann's copy? A. I had it in my suit case and took it to Duwamish Valley at Foster, where my wife had rented a summer cottage for a couple of months, and then we had it there for about a week, when I think the second Sunday I opened it up and my wife and I read parts of it. It remained there at Foster in that cottage until about the latter part of August, during the meantime, on the 21st of August we moved to a cottage at Alki Point in Seattle and we only had our personal belongings at Foster, and Mrs. Mills moved them up at different times in a couple of suit cases. During the meantime Miss Schuetz, the doctor's secretary, had phoned me that the doctor wanted this copy. Q. How many times do you think she phoned you? A. The doctor was going through Seattle from Lake Crescent to Portland and back again, and she asked me at least three or four times, as the doctor was very anxious to get this copy and was somewhat provoked because I had not gotten it. When it was brought up by Mrs. Mills I took it to the office and the wrappers had been destroyed or lost, so I rolled it up in one of my envelopes, and at Miss Schuetz' request mailed it to Dr. Dechmann at Lake Crescent, as he had just gone through from Portland to Lake Crescent, where his family was stopping. Q. About what date was that? A. The latter part of August; the rest of the time the copy was in the possession of Dechmann's attorney, Mr. Israel. Q. That was the same copy? A. The same copy, it was said

to be the same copy, and I never saw any other that I know of. Q. Did Miss Schuetz or Richards or Dechmann, or any one of these three, ever make any statement to you as to how or under what circumstances and by whom this stuff was composed or dictated? A. The only statements that were made was at the Butler hotel by Miss Schuetz that she had been working on it and how hard she had been working and that she was tired and had been taking dictation. Q. Did she say from whom? A. From Richards. Q. Did she ever say that Dechmann had dictated any part of it? A. No, she was very strict about that. Q. Did you ever have any other conversations about this with any of them? A. No, although we do live right across the street from Dechmann, we were then living temporarily at Foster, and Alki Point.

"(Signed)    Edgar G. Mills."

"State of Washington, ⎱ ss.
  "County of King.      ⎰

"I, Edgar G. Mills, being first duly sworn, on oath say: That I am the same Edgar G. Mills referred to in the foregoing statement and who made the answers to the questions propounded to me by Mr. S. C. Rose, prosecuting attorney of Clallam county, Washington, and that the answers contained in said statement were made by me as therein contained to such questions propounded by Mr. Rose; that I made such answers freely and voluntarily and of my own will. That I have read carefully said statement as herein contained and the whole thereof, and each of the questions with answers thereto as the same is contained in the annexed statement, and that the said answers are true answers to the questions propounded, respectively, and that said statement as a whole constitutes a true statement of the facts, matters and things therein referred to.

"(Signed)    Edgar G. Mills.

"Subscribed and sworn to before me this 5th day of January, A. D. 1917.

"(Signed)    J. William Hoar,
  "Notary Public in and for the State of Washington, residing at Seattle.
"(Notarial Seal.)"

In addition to these signed statements, there is testimony in the record to the effect that Mr. Mills told the witness Trumbull, at a time when the package referred to was in his possession and still undelivered, that he was on his way to the lake to try to make a settlement with Thompson, and that, shortly after the delivery of the package to Thompson, Mr. Mills told Mrs. Ovington that, at the time he so delivered the package, Thompson invited him to disembark from his boat and look over the grounds, and he declined this invitation because he had delivered papers that Mr. Thompson would not like, and it would not be good etiquette to accept his hospitality at that time.

That the true facts are to be drawn from this evidence is shown by the statement of defendant's counsel at the close of the complainant's case:

"I will say that I have availed myself of the time so graciously given me by the board to go through the matters introduced in evidence, and it is my opinion, and I so advised Mr. Mills, we had nothing to enlighten the board on at all. The matters are all here in evidence. I do not think anything Mr. Mills may say would shed any light upon this phase of this unfortunate source (course) of events. We have nothing to introduce."

What are the true facts applicable to the points in issue? It seems clear to us that Mr. Mills knew before he ever met Mr. Richards that Richards had some plan for obtaining a settlement with Thompson outside of the courts (Richards not being a lawyer), which he and Dr. Dechmann thought would be more effective than legal procedure; that Mr. Mills became aware of the nature of this plan when he met Dr. Dechmann and Richards at the Women's Exchange in Seattle, and was informed that he was to look up the law of blackmail, and was to examine and blue-pencil a state-

ment prepared by Richards, so that the penalty of the criminal law might be escaped; that Mr. Mills did examine the law of blackmail and extortion for the sole purpose indicated, and that, after he had done so, Richards submitted to him the proposed statement, partly written and the remainder oral, so that he (Mills) was fully advised of the charges which Richards contemplated making. "He had the thing down from 'A' to 'Z'," as he has it in Exhibit "A"; that Mills advised that the law of blackmail was very strict, and that to threaten to publish the proposed statement or history of Thompson's life, unless his demands, which were then known to Mr. Mills, for money and property were complied with, would constitute the crime of blackmail under the law of this state. Mr. Mills advised against the contemplated proceeding, and appears to have specially warned Dr. Dechmann to have nothing to do with it, and to have said to Richards: "Have you any idea you can pull off anything like you suggest and get away with it?" To which Richards replied: "I think I know my man." At the same meeting Mr. Mills started the preparation of the lease, the execution of which was afterwards demanded of Thompson, and an engagement was made to take dinner together on Sunday, two days later, at the Butler hotel. When Richards and Dechmann left Mr. Mills' office on that occasion there was no decision announced as to a future course of action. The same parties, with others, met at dinner on Sunday night, according to appointment, and Richards then produced two packages of papers. The stenographer, who was one of the party, told how hard she had worked all day to complete the documents, and Dr. Dechmann suggested that his son might deliver the package,

which was addressed to Thompson, to which Mr. Mills objected, saying:

"I do not want any of the Dechmanns to have anything to do with this, because if I ever do have a settlement with Thompson, this might aggravate it."

Then Mr. Mills reached over and received the two packages from Richards, and said:

"Now I do not know what is in this, and I do not want to know, and I won't know. I am simply going to act as a messenger boy . . ."

If ever there was a self-serving declaration made, this on its face, in the light of the attendant circumstances, was one. If Mr. Mills had for one moment believed that the purpose to blackmail had been abandoned, would he not have inquired as to the contents of the package and sought to know what of the filthy charges which had been minutely detailed to him had been eliminated? Would he have warned the Dechmanns to keep out of it? Would he have made the elaborate self-serving declaration of lack of knowledge? What innocent man, engaged in an innocent undertaking, would think of proclaiming such a lack of knowledge, and such an intention to remain ignorant? We think the utmost of human credulity could not justify the answer to these questions for which Mr. Mills contends, and that a preponderance of the evidence establishes the fact that Mr. Mills accepted the package and agreed to, and did, deliver it to Mr. Thompson, well knowing what the contents were. That this is so is further evidenced by the fact that the second package containing the duplicate of the papers, afterwards given to Thompson, was addressed to Dr. Dechmann, and though Dechmann was actually there present, it was not delivered to him, but to Mr. Mills, with the evident purpose that he, Mills, might, if he cared to,

read and examine the contents before he delivered the original, as well as by the statements made to the witnesses Trumbull and Ovington, hereinbefore referred to. In the package delivered by Mr. Mills to Mr. Thompson, referred to as Exhibit "A" in the criminal trials, and introduced in evidence here as Exhibit 2, appears the following as a part of Richards' demand upon Thompson:

"I am going to be in Lincoln by Friday, July 21st, and if on that day I do not receive through Mr. Mullen, payment in full for my stock as outlined heretofore, and the assurance from you by wire that papers sent you for signature, are on the way, I will withdraw my offer of settlement and proceed to vindicate Dr. Dechmann by the publishing of the article enclosed herewith, which will go to press on Saturday, the 22nd, and be mailed out all over the world not later than the following Monday."

That Mr. Mills had knowledge of this demand in substance, as well as of the contents of the package generally, is further conclusively established by the care taken by Mr. Mills to deliver the package to Thompson at the exact day and hour directed by Richards, and thereafter immediately telegraphing Richards that the delivery had been made at the appointed time. No argument is necessary to convince the unbiased that a mere messenger boy, without knowledge of the contents of the package and the purpose sought to be accomplished, would have taken the pains and trouble necessary to relay a telegram by telephone with any such particularity. While we would most gladly have found otherwise, if the facts would have warranted, and have thus avoided the stern duty which now is before us, yet, under the undisputed evidence in this record, we must find that the defendant's statement, as a whole, over-rides his self-serving declaration of

lack of knowledge, and that he has been guilty of a crime involving moral turpitude under our criminal code, Remington's Code, §§ 2613, 2007, which read as follows:

"Sec. 2613. Blackmail.—Every person who, with intent thereby to extort or gain any money or other property or to compel or induce another to make, subscribe, execute, alter or destroy any valuable security or instrument or writing affecting or intending to affect any cause of action or defense, or any property, or to influence the action of any public officer, or to do or abet or procure any illegal or wrongful act, shall threaten directly or indirectly—

"(1) To accuse any person of a crime; or

"(2) To do any injury to any person or to any property; or

"(3) To publish or connive at publishing any libel; or

"(4) To expose or impute to any person any deformity or disgrace; or

"(5) To expose any secret.
Shall be punished by imprisonment in the state penitentiary for not more than five years or by imprisonment in the county jail for not more than one year, or by a fine of not more than one thousand dollars, or by both fine and imprisonment."

"Sec. 2007. Distinctions Relating to Accessory Abolished.—No distinction shall exist between an accessory before the fact and a principal, or between principals in the first and second degree, and all persons concerned in the commission of an offense, whether they directly counsel the act constituting the offense, or counsel, aid and abet its commission, though not present, shall hereafter be indicted, tried and punished as principals."

In one thing we agree with the defendant: In his brief, referring to the recommendation of suspension made by the state board of law examiners, he says:

"A suspension of one year can have no more effect on his business than has already been produced by this

case. Defendant asks no such clemency as appears to be suggested by this board. Mills either knew the contents of the packages or did not know. If it is proven under the evidence that he knew, disbar him permanently."

Mr. Mills is a man of mature years, with a long experience as a practicing attorney. Youth, inexperience, sudden temptation, and like excuses do not apply, as he himself has said. And, upon the evidence, it becomes our duty to direct that he be permanently disbarred and his name stricken from the rolls.

It is so ordered.

FULLERTON, CHADWICK, PARKER, and MACKINTOSH, JJ., concur.