[No. C. D. 1007. *En Banc.* December 4, 1940.]

*In the Matter of the Proceedings for the Disbarment of* WILLIAM A. BEAKLEY.[1]

*S. M. Brackett*, for the board of governors.

*William A. Beakley, pro se.*

ROBINSON, J.—This matter comes before us pursuant to the disciplinary rules and upon the following recommendation:

"To the Honorable Judges of the Above Entitled Court:

"BE IT KNOWN that at the meeting of the Board of Governors of Washington State Bar Association held

[1]Reported in 107 P. (2d) 1097.

at Seattle, Washington on the 8th day of June, 1940, all members of the Board being present, the record in the above proceedings was reviewed and it was unanimously resolved (Hugo Metzler not participating) that the Findings of the Trial Committee be approved; that upon said Findings, the Board recommends that Respondent W. A. Beakley be suspended from the practice of law in the state of Washington for the period of one year and thereafter until he shall have repaid to G. W. Franklyn the sum of $1250.00 and shall have paid to Washington State Bar Association the costs expended in these proceedings and hereby taxed in the sum of $164.28."

After the matter was docketed in this court, the respondent filed a demurrer, and, at the hearing thereafter held, appeared personally and argued both issues of law and issues of fact. His demurrer was based upon several grounds, all of which, however, are summarized in his last specification which, in attacking the constitutionality of certain sections of Remington's Revised Statutes, makes the following contention:

"(5) That the whole act, embraced in Secs. 139-1 to 139-23 [is unconstitutional] for the reason that no provision is made for a trial by jury; No provision for a trial in the Superior Court; No appellate provisions."

The proceedings against him were not carried on under those sections of the statute, but in accordance with the rules for discipline of attorneys adopted by the board of governors of the state bar association and approved by this court following the enactment of chapter 94, Laws of 1933, p. 397 (Rem. Rev. Stat. (Sup.), § 138-1 [P. C. § 192-21] *et seq.*). These rules succeeded the statutory procedure of which respondent complains and may be found in the supplement to Volume 1, Rem. Rev. Stat., pp. 88-100, and in Volume 193 of our reports at page 87-a *et seq.*

But, considering the respondent's demurrer as attacking the constitutionality of the procedure actu-

ally followed in his case, there is no merit in it. The questions raised by the demurrer have long been settled adversely to respondent's contentions in all jurisdictions whose systems of judicial administration are based upon the common law of England. 7 C. J. S. 728, § 18; 5 Am. Jur. 410, § 249 *et seq.* Our own reports contain numerous opinions which are in full accord with the principles stated in these texts. As typical examples, see *In re Lambuth,* 18 Wash. 478, 51 Pac. 1071; *In re Robinson,* 48 Wash. 153, 92 Pac. 929, 15 L. R. A. (N. S.) 525; and *In re Bruen,* 102 Wash. 472, 172 Pac. 1152.

The respondent stoutly contended in this court that, as a matter of fact, he was not guilty of any professional misconduct justifying disciplinary measures. We are, therefore, invited, and indeed compelled, to undertake the unpleasant task of setting out the facts as they are shown in the record.

We have examined the transcript of the evidence and the exhibits attached thereto, in the light of the long written argument filed by respondent in an effort to show that the evidence does not warrant the findings made by the trial committee and the recommendation by the board of governors. Our conclusion is that the evidence fully supports the findings. It remains to determine what disciplinary measures, if any, the findings warrant and justly require.

Only a summary of the long and detailed findings can be given within the limits of this opinion. As to the first charge of the complaint, the substance of the finding is as follows: In September, 1937, Mrs. Edna Thompson, of Bremerton, believed that she was entitled to receive from two Bremerton theaters the sum of $350, proceeds of a "bank night." The theaters refused to make payment. Mrs. Thompson and her husband consulted Mr. Beakley, believing that, as city

attorney, he was in a peculiarly good position to enforce Mrs. Thompson's demand. He confirmed that impression. The interview culminated in a written agreement to the effect that Beakley should receive for his services one-half of whatever portion of the $350 he might recover. Pursuant to this contract, Mr. Beakley brought an action. The defendant theaters interposed a general demurrer. The trial judge, after examining the complaint, came to the conclusion that the plaintiffs were suing to recover the proceeds of a lottery, and ruled that the court, for reasons of public policy, would not lend them its assistance.

About a month later, on November 26, 1937, the attorney for the defendant theaters gave his check to Mr. Beakley for the sum of $350. On the face of the check, in the upper left-hand corner, was written, apparently in the handwriting of the maker: "Settlement Thompson v. Tower & Rialto Theaters."

Within a few days, Mr. Beakley, without telling his clients that he had settled the case or received anything from the defendants with respect thereto, began to agitate an appeal. The Thompsons discouraged it, not being willing to incur any costs in the matter. On December 9, 1937, Beakley appeared at the Thompson residence. He brought with him a written instrument, captioned in the case and purporting to embody a proposition made by Mrs. Thompson for his acceptance. As finally completed, by filling in the blank stating his compensation and by execution, the instrument read as follows:

"Heretofore, on September 23, 1937, the plaintiff, Edna Thompson, entered into an agreement with W. A. Beakley, as her attorney, to prosecute the above entitled matter to judgment. It was agreed that the said W. A. Beakley would prosecute this matter to judgment for a commission of 50% of what was recovered in the above court. There was no agreement

as to costs in that court. This matter was heard in October, 1937, upon demurrer of defendants, and the court held that the agreement sued upon, was void because the same is a lottery and not enforceable under the laws of this state.

"The said attorney, W. A. Beakley, is desirous of appealing from the decision of the above court to the supreme court and it is hereby mutually agreed, as follows:

"That the first parties are hereby released from all costs and claims for the suit in the above court and from all claim for any cost, of every nature upon appeal and that in consideration of the said attorney, agreeing hereto, he may take same to the supreme court at his own costs and pay all costs therein and hold the above plaintiffs harmless from all costs and expenses in the above court, and instead of the above named division, the said attorney is to have the sum of $200 00/100 if he shall recover same or any part thereof, but no costs or claims shall be paid or assumed by plaintiffs or either of them.        EDNA THOMPSON

"I hereby accept the above proposition.

"W. A. BEAKLEY
"Atty. for Plfs."

Evidently, Mrs. Thompson was encouraged to believe that there might still be a settlement of her claim; for it is undisputed that, after the parties made the above agreement, she inquired of the respondent, on several occasions, if he had received any settlement, and on each occasion was told that he had not. Late in January, Mrs. Thompson heard, from what she believed a reliable source, that a settlement had been made. Procuring a friend to accompany her as a witness, she went to Mr. Beakley's office late in January, 1938, in a somewhat belligerent mood, and asked him if that were so. Mr. Beakley assured her that no settlement had been made, but added that he might make some sort of a settlement within three days. In

about that length of time, Mrs. Thompson received a letter from Beakley, saying in part:

"I have received $350.00 and have this day handed to their attorney a release in full. The only other amount I could have charged was the $5.00, the receipt of which I showed you the other day when you and your friend were in, but they made an offer of $350.00 without costs and I accepted."

Enclosed was a check for $172.50, Mr. Beakley having deducted five dollars from the amount he had received the previous November before making the division, a trifling matter, but in violation of the release as to costs in the lower court made in the second contract.

The respondent does not deny; he interprets and explains. He contended before the trial committee and to the board of governors and before us that he did not lie to his client when he told her on numerous occasions that he had not received any money for her account. His position was, and is, that, as the matter then stood, the law of the case was to the effect that she had no right to the proceeds of a lottery; therefore, no right to the money which he had received from the defendant theaters; therefore, he truthfully said that he had received nothing belonging to her. He further contends that there was no settlement. He says that a legal settlement of an illegal claim is an impossibility. He also contends that, since the trial court held that his client had no legal claim, it not only cannot be concluded that the money was not paid to discharge a claim, but that, in truth and in fact, the money was paid to prevent an appeal of the case.

We do not think it necessary to waste effort and space in answering these somewhat rarefied contentions. What the defendant's motives may have been for making the settlement, is completely immaterial. It was a settlement none the less, and the respondent so

acknowledged in writing when he endorsed the check bearing the notation on its face: "Settlement Thompson v. Tower & Rialto Theaters."

As to his acts in promoting an appeal under these circumstances, the respondent says that he did so in the hope of securing a decision by this court that bank nights are illegal. He states that the merchants of Bremerton were opposed to their continuance; that the fire chief hoped that they might be abolished because they created fire hazards by collecting crowds in the streets, and that at least twenty of his fellow members of the Eagles Lodge besought him to appeal, in an effort to have them declared illegal, and agreed to defray the necessary costs. He adds that, as city attorney of Bremerton and a long-time member of one of its churches, it was his duty, both as a lawyer and as a church member, to appeal in an attempt to have bank nights declared illegal, and continues to insist that he regrets that the proposed appeal had to be dropped because the Eagles failed to raise sufficient money to defray the costs.

These protestations of civic virtue and Christian piety must be somewhat discounted in the face of the fact that, while intending to prosecute the appeal in order to lose it, he thriftily procured an agreement from Mrs. Thompson for additional compensation in case he should accidentally be victorious. And all the time he had the full amount of his client's demand in his possession.

As bearing upon the question as to whether the respondent should be allowed to continue the practice of law, the trial committee regarded these attempted justifications as even more significant than the respondent's acts; for, as the committee said in its report to the board of governors, they indicated that he has no conception of an attorney's duties to the courts,

his fellow attorneys, or to his clients. The case was settled, and the settlement had been executed. An appeal under the circumstances would have constituted a fraud upon this court, a fraud upon the defendants' attorney, a fraud upon the defendants themselves, a fraud either upon his client, to whom he was in duty bound to win the appeal, or upon the persons who provided the costs of waging it, to whom he would have been in duty bound to make every effort to lose it.

The second charge against the respondent was to the effect that, as attorney for the city of Bremerton, he had collected the sum of $450 from the city upon a representation that, as such city attorney, he had expended that amount in paying the salary of Miss Claire Duncan, a stenographer employed by him on city work; and that he so testified under oath at the trial of an action between himself and the city, whereas the fact was that he had paid Miss Duncan but five dollars per week for a portion of the period, and ten dollars per week for the balance thereof. The respondent objected to the taking of any evidence on this charge, upon the ground that the action in which he was charged with having so testified was still pending on appeal to this court. The trial committee allowed the objection and ordered that the charge be held in abeyance until the appeal should have been heard and decision made. A decision has been rendered, and it would be a vain and useless thing to send this charge back to the trial committee to find the facts for our information; for we have judicially found them in ruling upon the appeal. They fully substantiate the charge. *Beakley v. Bremerton,* 5 Wn. (2d) 670, 105 P. (2d) 40.

The third charge grew out of respondent's transactions with Gilbert William Francklyn, an elderly man who had for some years been his client and personal friend. Mr. Francklyn had had but little or no ex-

perience in business matters, and depended largely for his living upon a monthly remittance from a family trust estate in Halifax, Nova Scotia. Upon the death of his mother, it occurred to him that he might be able to secure his share of the corpus of the trust property, and it seemed to him to be advisable to do so, in view of the prospect of a European war which would probably involve the Canadian provinces. Mr. Francklyn consulted Mr. Beakley about the matter. He was of that opinion also, and agreed to undertake the necessary negotiations. First, however, he told Mr. Francklyn that he could do nothing without a power of attorney. The instrument which Beakley prepared, and Francklyn and his wife signed, was not merely broad enough for the specific purpose involved, but gave Beakley unlimited power with respect to the trust property. The power was executed on August 17, 1937. The securing of the transfer of the trust property from the Canadian trustee was readily arranged. Bonds of the face value of $8,600 came into Mr. Beakley's hands in 1938. Early in 1939, he secured the signature of Francklyn and wife to the following instrument:

"THIS AGREEMENT OF AGENCY, made and entered into by and between Gilbert W. Francklyn and Mildred Francklyn, husband and wife of Poulsbo, RFD No. 1, Box 146, Kitsap County, State of Washington, parties of the first part, and W. A. Beakley of 12-14 Harrison Building, Bremerton, Washington, party of the second part, WITNESSETH:

"That one of the said first parties, Gilbert W. Francklyn, has certain properties coming to him from the estate of G. E. Francklyn, his father, who formerly lived at Halifax, Nova Scotia, Dominion of Canada, and that the said Mildred Francklyn is his wife and they are desirous of having the said second party to handle this property, to invest the same, loan the same out to parties desiring to borrow, to make such loans, to re-

lease such mortgages, to purchase property, to execute deeds for same and to do any and all things which the said first parties might, could or would do, as provided in the general Power of Attorney heretofore entered into.

"That this agreement is supplemental to the said Power of Attorney and is for the purpose of setting the compensation to be received by the said second party for his services in handling this property.

"That all of the interest derived from the property, mentioned in the said Power of Attorney, shall be invested by the said second party, and the said second party is to handle the interest, collect same, as provided by the said Power of Attorney, re-invest the same as provided therein. IT IS HEREBY UNDERSTOOD AND AGREED that all of the interest derived from this property as received or as re-invested by the said second party shall be the exclusive property of the first parties up to and including FIVE (5) PER CENT. That when any of this property or the proceeds thereof is invested and the investment or the proceeds thereof bring a higher rate than FIVE (5) PER CENT per annum, then the said interest or investment over and above the said 5% per annum shall be the sole and separate property of the said second party for his use and benefit for his work and responsibility in looking after this property and investing and re-investing the same.

"That if certain bonds and mortgages or bonds or mortgages are received by the said second party, W. A. Beakley, which shall not bear a greater interest than 5%, then the whole of the said interest shall be turned over to the said first parties when it shall be collected and the said second party shall not be held for any higher rate than the said bond or mortgages produce.

"That the said second party shall make a report of his handling of the said property, closing the first year December 31, 1938, and annually thereafter and said report shall be furnished the said first parties not later than January 15, 1939, and annually thereafter. That the interest shall be turned over to first parties in monthly installments, so far as it is possible to do so.

"IN WITNESS WHEREOF, the parties have hereunto set their hands this 9th day of January, 1938."

Two days later, Mr. Beakley received from the Canadian trustee $18,801.69, and $2,500 in bonds, raising his total receipts of Francklyn property to approximately thirty thousand dollars.

The agency agreement, above quoted, is, on its face, an instrument of an overreaching character. As construed by Mr. Beakley, it was appallingly so. We cannot go into the full particulars concerning his management of Francklyn's property. It will suffice to relate, as briefly as may be, the story of one or two transactions.

At the time the agency agreement was entered into, Beakley was living in a house which he had purchased on contract. According to his own testimony, it was badly run down; taxes were overdue; and he still owed the bulk of the purchase price. Within two weeks after receiving the large sum in cash above mentioned, Mr. Beakley spent $1,050 of the Francklyn money in repairing the house, another $2,700 in paying the delinquent taxes and the balance due on the purchase contract. He then deeded the property to Francklyn. He told Francklyn nothing of this, but continued to occupy the house, later charging himself with five per cent interest on $3,750, or $187.50 per annum, although he admits that the rental value was $32.50 per month, or $390 per year. This he justifies by that provision in the contract which reads as follows:

"That when any of this property or the proceeds thereof is invested and the investment or the proceeds thereof bring a higher rate than FIVE (5) PER CENT per annum, then the said interest or investment over and above the said 5% per annum shall be the sole and separate property of the said second party for his use and benefit for his work and responsibility in looking after this property and investing and re-investing the same."

Some months later, the Francklyns heard that they

were reputed to be the owners of the Beakley house. They went to the courthouse, and, with the assistance of a friend, attempted to find out if this was true. They not only found that they held the title, but, also, to their surprise, that they had loaned $1,500 to Beakley's wife, secured by a mortgage upon a two and one-half acre tract which she had owned in the vicinity of Tracyton. After making the mortgage, the title to the property had been transferred to a corporation which was officered by, and completely under the control of, Beakley and wife.

There is a conflict in the evidence as to the value of this property. There is testimony in the record, given by duly qualified real estate dealers, that it was worth from $1,000 to $1,400 at the time the hearing was held before the trial committee, and probably less at the time the mortgage was made. That date, April 25, 1938, is very significant. This was months before the agency agreement was entered into. Beakley, at that time, had merely a general power of attorney, and he took advantage of that fact to loan his clients' money to his own wife. With respect to this transaction, he is substantially as censurable as the respondent was in the case of *In re Smith*, 3 Wn. (2d) 455, 101 P. (2d) 311.

According to the Francklyns, Beakley did consult them concerning a plan to build an apartment house on a plot of ground he had acquired for $2,500. They say it was to cost about sixteen thousand dollars; Mr. Beakley says, however, that it was to cost ninety thousand dollars, consisting of twenty thousand dollars of the Francklyns' money and seventy thousand dollars to be borrowed on a mortgage. This project had not gotten beyond the promotion stage when the Francklyns, having made the discoveries at the courthouse, hereinbefore mentioned, secured another lawyer, and demanded an accounting. But, in making the account-

ing, Beakley claimed credit for $1,400 paid to an architect (wholly without the Francklyns' knowledge) for the apartment house plans. He also charged five hundred dollars on this account for "Attorney's fees and work on Apt. plans, etc., 1939," and, although he had previously rendered an account in 1938 which made no mention of attorney's fees, he included in his final account two hundred and fifty dollars attorney's fee for 1937, and five hundred dollars for 1938. It is reasonably inferable that these charges for attorney's fees were afterthoughts, dragged in in an attempt to balance his account.

Of the apartment house project, the trial committee said, in its report to the board of governors:

"Of the proposed apartment house construction, the most charitable thing the committee can say is that it was a visionary proposition. The idea of risking some $20,000 on an enterprise of this character, with a $70,-000 mortgage as a prior lien, as an investment for an elderly man and wife who for years had been dependent on a reliable livable monthly income, is at least contrary to good business judgment, and palpably so. The committee does not believe that Beakley could have made these investments, believing in good faith that he was carrying out the terms of the agency or trust agreement."

But if we adopt a more charitable view with respect to the matter and find that he did act in good faith, it leaves Mr. Beakley in no better light. His position in regard to the transactions with Francklyn, as revealed by his own evidence, his written argument submitted to the board of governors, and his oral argument in this court, is that he was bound by no limitation other than to make the property return five per cent, if he could, and not greatly different than if he had, dealing at arm's length, borrowed the money from a stranger at five per cent interest. In fact, he was careful not to

obligate himself to pay five per cent. We quote from the agency agreement:

"That if certain bonds and mortgages or bonds or mortgages are received by the said second party, W. A. Beakley, which shall not bear a greater interest than 5%, then the whole of the said interest shall be turned over to the said first parties when it shall be collected and the said second party shall not be held for any higher rate than the said bond or mortgages produce."

It therefore appears, with respect to this third charge, as it did with respect to the first, that respondent's attempted explanations and justifications only strengthen the impression that he should not be permitted to practice law, for, although he has practiced for about fifty years, he has not yet learned, or at least will not admit, that the relation of an agent to his principal is highly fiduciary in character. During the existence of the agency relation, the relation of attorney and client also existed, as is shown by respondent's charges for attorney's fees covering that period. The respondent either does not know or will not admit that this is one of the strongest fiduciary relationships known to the law.

"The relation of attorney and client has always been regarded as one of special trust and confidence. The law therefore requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them. So strict is the rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be prima facie fraudulent, and to sustain a transaction of advantage to himself with his client the attorney has the burden of showing not only that he used no undue influence but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client

as it would have been had the client dealt with a stranger." 7 C. J. S., Attorney and Client, § 127.

We attach no especial weight to the fact that respondent, while practicing in another state, was suspended for a period of thirty days. The record as to the cause for the suspension is vague and uncertain. The respondent says that it was occasioned by political enmity, and for all that appears in the record this may be true.

We realize from past experience that whatever action we take in this case, whether by way of disbarment or of suspension, will be criticized by laymen, and even by some members of the bar. It will be said, if disbarment be ordered, that the punishment is too severe, and, if a suspension be ordered, that, considering the respondent's age, it will amount to a disbarment; and in either case, that the difficulty of making a living at the law in these times of economic stress should have been given more weight and consideration.

A plea for mercy must always command a certain amount of respect, but such pleas have no place in a matter of this kind. Neither disbarment nor suspension is ordered for the purpose of punishment, but wholly for the protection of the public. When a matter such as this comes before the court, the question presented is not: What punishment should be inflicted on this man? The question presented to each of its judges is simply this: Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney? The casual critic has no such personal responsibility.

The trial committee has recommended a suspension for one year and until the respondent shall

have repaid to Mr. Francklyn the sum of $1,250 and to the bar association the costs of these proceedings.

Although it may be just to require the payment of such costs, it is not, to our knowledge, provided for by any existing rule. There is precedent for the provision requiring repayment to a wronged client before allowing reinstatement; but we do not desire to establish that practice. It is frequently the case, although we have no reason to think it so here, that, unknown to the trial committee, there are numerous wronged clients. In such cases, the making of such an order would give a kind of preference.

The respondent stoutly maintained before the trial committee and the board of governors that his admitted conduct with respect to the Thompson and Francklyn matters was not only not wrongful but that it was strictly ethical. He maintained this attitude throughout, saying in the last paragraph of his written argument submitted to the board:

"Respondent yields to no one in his zeal for the ethics of the legal profession."

The committee and the board were, therefore, amply justified in concluding that, afforded the opportunity, he would repeat that conduct under similar circumstances.

Since the trial committee made its recommendation and since the board of governors approved it, it has been judicially determined that, during the same period covered by the committee's report, the respondent was guilty of additional derelictions of an even more serious character, namely, that he not only defrauded a client, the city of Bremerton, but also testified falsely in open court in an attempt to retain the proceeds of the fraud. *Beakley v. Bremerton*, 5 Wn. (2d) 670, 105 P. (2d) 40.

With this record of consistent ill-conduct before us

and with the respondent refusing to recognize it as such, we are unable to say that he will be worthy of confidence at the end of one year, or two, or three, or any definite number of years.

It is ordered that, upon the expiration of thirty days after the filing of this opinion, the respondent's name be stricken from the roll of attorneys, and that he, from that date, be debarred from practicing law in this state.

ALL CONCUR.