[No. C.D. 3581.   En Banc.   July 24, 1980.]

*In the Matter of the Disciplinary Proceeding Against* ROBERT J. SALVESEN, *an Attorney at Law.*

*Jack J. Cullen,* for Bar Association.

*Hugh A. Knapp* (of *Knapp, O'Dell & Pinkerton*), for respondent.

WILLIAMS, J.—This attorney disciplinary proceeding is before the court pursuant to the Discipline Rules for Attorneys. Prior to the institution of this action, respondent Robert J. Salvesen's attorney and the Washington State Bar Association entered into a stipulation of facts which formed the basis of a formal complaint filed on August 8, 1978. In his answer respondent admitted the allegations of the complaint, and the facts in the case are substantially undisputed. Respondent's only resistance to the proceeding is to the severity of the sanctions recommended by the Disciplinary Board of the bar.

The findings of fact establish the following:

From October 1976 to early December 1977, respondent engaged in a series of transactions involving the misuse of client funds which had been or should have been held in his attorney's trust account.

With one exception, the transactions involved respondent's transfer of client funds into and out of his own personal checking account. During the period the funds were supposedly in respondent's trust account the balance in the account was at times insufficient to disburse the funds to clients had they so requested. Moreover, several checks drawn by respondent on the trust account were drawn on insufficient funds, and respondent found it necessary to transfer funds from his personal checking account into the trust account in order to cover them.

In the remaining transaction, respondent received a cashier's check for $7,250 payable to Warren Slaughter, a client. At the time respondent received the check Slaughter was living in California. Without first contacting Slaughter or forwarding the check to him, respondent endorsed Slaughter's name on the check and deposited it into his attorney's trust account. He thereafter held the funds in the trust account, not disbursing them until Slaughter demanded the funds.

Throughout the period October 1976 through December 1977, respondent made a regular practice of withdrawing funds from his attorney's trust account on checks made payable to Robert Salvesen or, on two occasions, to Virginia Salvesen, his wife. Although he considered those withdrawals to be fees for legal services, he did not maintain sufficient records to establish that fact.

In December 1977, after receiving several complaints from clients and from respondent's law partner, the Washington State Bar Association began an investigation. After filing of the formal complaint, a hearing was held on December 13, 1978. The hearing officer submitted findings of fact and conclusions of law concluding that respondent had violated (CPR) DR 9–102(a) and (b) and (CPR) DR 1–

102(A)(1) and (4) of the Code of Professional Responsibility and DRA 1.1(a) and (i). All of these violations were attributable to respondent's handling of his trust account as described above. The Disciplinary Board adopted the findings and conclusions and recommended disbarment, with one member of the board filing a dissent recommending a 3–month suspension.

Attorney discipline does not have as its object the imposition of punishment of the offending lawyer. *In re Nelson,* 87 Wn.2d 77, 81, 549 P.2d 21 (1976). Rather, the primary purpose of disciplinary actions is to protect the public and to preserve confidence in the legal profession and the judicial system. *In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974).

When lawyers use clients' funds for their own personal use or mishandle trust funds, disbarment is the usual result. *In re Kumbera,* 91 Wn.2d 401, 403, 588 P.2d 1167 (1979); *In re Deschane,* 84 Wn.2d 514, 517, 527 P.2d 683 (1974); *In re Batali,* 85 Wn.2d 246, 251–52, 533 P.2d 843 (1975). It is not the inevitable result, however, and the appropriate sanction should be determined on a case–by–case basis after consideration of all the circumstances. *Kumbera,* at 404; *In re Gibson,* 90 Wn.2d 440, 442, 583 P.2d 633 (1978).

There is no question, and indeed respondent concedes, that his violations are extremely serious. They are serious not only in nature but in number. That fact alone does not necessarily resolve the matter, however, and in accordance with our previous cases we must consider aggravating and mitigating factors before we decide whether to impose on respondent the sanction which will end his legal career.

The hearing examiner found, and justifiably so, that respondent's conduct was aggravated not only by its serious nature and potential consequences but by the extended period over which it occurred. Moreover, respondent knew that his conduct was improper, yet did not desist until the bar commenced its investigation. Such behavior standing

alone could call for disbarment. However, there are several factors which we think mitigate the severity of the discipline we should impose.

First, respondent was admitted to the practice of law in 1950, and in all the years since he has never been the subject of a disciplinary proceeding. For 18 years he was the City Attorney for Stevenson, Washington, and for 12 years the elected Prosecuting Attorney for Skamania County. For 25 years he successfully operated a title company in addition to his law practice and was director of a local bank. His background, career in the law, and reputation in the community where he lives and works are wholly inconsistent with the conduct that has led to his present predicament.

Second, respondent's clients have suffered no financial loss. Indeed, he was always able to pay when called upon. Checks presented for payment at the bank were never returned to a client because of insufficient funds in the account. All but one client received the funds due them prior to commencement of the investigation by the bar, and respondent paid the remaining client on demand shortly thereafter. Respondent explained, and there is no finding to the contrary, that the lapse of time between receipt of the funds and payment to clients resulted from either procrastination on his part or the nature of the transaction and not from an inability to pay the sum due.

Third, respondent has fully and completely cooperated with the bar in its investigation. He stipulated to all acts of misconduct and voluntarily provided the documents to support the findings. Following commencement of this investigation, he asked that he be allowed to continue to practice law and sought assistance from the bar in setting up a proper accounting system in his office for his trust accounts, which throughout his years of practice had never been managed in accordance with acceptable standards. The bar permitted him to continue practice pending a decision by this court and provided the requested service. Twice monthly the bar checked his accounts and found them to be in complete compliance with good business

practice. Indeed, bar counsel stated to the examiner at the opening of the disciplinary hearing:

> As state bar counsel who investigated this case I do want to say that during my investigation Mr. Salvesen has been at all times very cooperative. He has complied with each and every request and shortly after the first contact I had asked Bob to produce and supply to me twice a month the records of his trust account, copies of his bank statements and copies of all cancelled checks. Since that request Bob has complied faithfully in each and every case; has twice a month at least provided me at the bar office copies of all his trust account activities. Those records on their face disclose proper conduct with respect to his trust account.

In contrast, we have suggested that lack of cooperation with a disciplinary investigation is a factor which may aggravate the discipline imposed. *Deschane,* at 515–16.

At no time has respondent attempted to excuse or defend his conduct. He candidly admits his wrongdoing, has expressed remorse, and exhibits a sincere desire to be given another chance to prove he can practice law according to acceptable standards. His demonstrated ability to conform his conduct to the requirements of the profession, along with his expressions of contrition, are certainly factors we must take into account. *Kumbera,* at 405.

Fourth, soon after the commencement of the bar's investigation, the allegations of mishandling of trust funds became widely known in respondent's community, which is by now fully aware of respondent's shortcomings. In spite of that, he still seems to enjoy support and confidence from his community. In June 1977, at a time when respondent was issuing checks on his overdrawn trust account, he resigned from the board of directors of the bank. Three of his clients, each of whom was aware of his improper conduct, sent expressions of confidence in his integrity to the bar and in fact still employ him as their attorney. Moreover, at the time of the hearing the bank for which he had been a director still retained him as legal counsel.

Finally, prior to the hearing before this court, the Disciplinary Board appeared to qualify its recommendation of disbarment. Through its chairman it sent a letter to this court expressing the board's uncertainty about the sanctions required under our previous cases involving trust account violations. The board apparently understands our cases to hold that such violations require disbarment as the only appropriate sanction which can preserve the public's confidence in the legal profession and judicial system. The board went on to say, however, that if less severe discipline could be imposed in this case, Mr. Salvesen merited such consideration.

We do not now nor have we ever held that trust account violations per se result in disbarment. *Gibson,* at 442; *In re Robinson,* 89 Wn.2d 519, 520–21, 573 P.2d 784 (1978); *Deschane,* at 516. Our recent cases reveal that disbarments for such violations have always been accompanied by other kinds of misconduct and the absence of mitigating circumstances. *See, e.g., In re Zderic,* 92 Wn.2d 777, 600 P.2d 1297 (1979). If the rule were otherwise, then disbarment might be appropriate in this case. But if disbarment inevitably followed trust account violations, then there would be no need for a hearing where, as here, the lawyer admits the violations. As we have previously stated, sanctions must be determined on a case–by–case basis.

Disbarment is the harshest discipline, the ultimate sanction which we can impose. To order it in this case would give insufficient weight to the mitigating factors we have discussed and treat respondent as the ultimate offender. This is not appropriate. The sanction we propose is severe and adequately fulfills the purposes of attorney discipline. Accordingly, we order respondent suspended from the practice of law for a period of 2 years from the date of the filing of this opinion.

UTTER, C.J., and ROSELLINI, DOLLIVER, and HICKS, JJ., concur.

STAFFORD, J. (dissenting)—In all candor I must commend the earnestness, sensitivity and eloquence with which attorney for respondent handled his client's defense. It was in the highest tradition of a member of the Bar. Nevertheless, I simply cannot countenance this court's serious drift away from meaningful attorney discipline at a time when we should be supporting the Bar in its effort to maintain the honesty and integrity of a profession faced with explosive growth. Unfortunately, the court has weakened its stand by a show of magnanimity to the few dishonest members of the legal profession. In so doing, the majority has given an unmistakable signal to all who would steal from their clients' trust account, that it no longer considers those funds absolutely inviolate.

The court seems to consider theft a somewhat lesser offense if one steals only from one's unsuspecting friends, expresses contrition when caught, attempts to arrange some restitution, and promises not to repeat the thievery. This places the depredations of the dishonest lawyer on the same footing as the common criminal who seeks probation, yet the two cannot be equated. The lawyer is a well trained, highly skilled, professional practitioner on whom the public is virtually forced to rely for counsel, protection of one's personal and business interests, as well as the care and safekeeping of one's financial well–being.

Lawyers routinely process funds through their trust accounts, aggregating very substantial amounts. Clients and other transacting parties entrust these funds to lawyers without hesitation, often without documentation. Thus, the development and preservation of public trust and confidence in the legal profession, as well as our entire legal system, demands that lawyers preserve the integrity of entrusted funds and that they promptly, accurately and fully account for such funds. *In re Deschane,* 84 Wn.2d 514, 516, 527 P.2d 683 (1974). In short, it is absolutely necessary that lawyers employ the utmost honesty with respect to a client's trust account.

The invasion of personal funds placed in a lawyer's trust account cannot be condoned, or rationalized. The personal urgency of the moment and the personal problems that may engulf a lawyer can neither excuse nor justify a violation of that trust however faithful to his trust a lawyer may have been in the past. *In re Cary,* 90 Wn.2d 762, 585 P.2d 1161 (1978). To hold otherwise is unfair to potential victims among the public and is equally unfair to the vast majority of honest lawyers who will have their good reputations tainted by the dishonesty of a few.

Disbarment has been, and still is, the proper sanction for the misappropriation or misuse of clients' funds. *In re Zderic,* 92 Wn.2d 777, 787, 600 P.2d 1297 (1979); *In re Cary, supra; In re Robinson,* 89 Wn.2d 519, 573 P.2d 784 (1978). In fact, for years we have held almost without exception, that the failure, refusal, conversion, embezzlement or inability to properly disburse or account for funds entrusted to the care of a lawyer begets disbarment. *In re Zderic, supra; In re Cary, supra; In re Robinson, supra; In re Kirchen,* 83 Wn.2d 727, 522 P.2d 188 (1974); *In re Hutchins,* 67 Wn.2d 144, 406 P.2d 777 (1965); *see also In re Gibson,* 90 Wn.2d 440, 583 P.2d 633 (1975); *In re Batali,* 85 Wn.2d 246, 533 P.2d 843 (1975); *In re Deschane, supra.*

Unfortunately, the majority, acting out of a high degree of misguided compassion, as they did in *In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979), is implicitly endorsing a course of lawyer misconduct that encompasses pure and simple dishonesty.

Having reiterated the need for utmost honesty in dealing with a client's trust account, I shall address the dishonesty and violations of trust with which we are concerned in this case. To understand the frequency and magnitude of the problem, however, it is necessary to make a more complete disclosure of respondent's activities than appears in the majority opinion.

With but one unimportant exception respondent has not challenged the facts found by the Washington State Bar

Association's hearing officer. These facts reveal the following:

1. In late 1976, Mr. Richards retained respondent to assist in a real estate transaction. In March 1977, Richards gave respondent a personal check for $4,400 for the express purpose of satisfying closing costs and paying off a contract on the real estate being purchased by Richards. Respondent did not deposit the $4,400 in a trust account for his client, however. Rather, he deposited it in his personal checking account to cover a personal overdraft of approximately $1,478.48. Respondent did not pay off the contract or the closing costs until December 1977, some time after his partner complained to the Bar Association about respondent's defalcation. Thereafter, respondent obtained the necessary bank draft by using his personal funds.

2. In late 1976, respondent was also retained as a stakeholder between the Farm Home Administration and Rock Creek Terrace Limited. He received a treasury check from FHA for $569,960, deposited it in his attorney's trust account and on the same date disbursed $559,960 to Security Intermountain, a mortgage holder of Rock Creek. The remaining $10,000 supposedly was held safely in respondent's trust account. The balance of that trust account, however, dropped as low as $3,411.08. In fact, part or all of the $10,000 belonging to Rock Creek had been used by respondent to pay obligations owed to other clients whose funds had been used in unrelated transactions. Thus, had the funds been demanded, respondent would have been unable to pay Rock Creek from the trust account. In March of 1977, Rock Creek finally received $10,000 as a payoff of the final proceeds of the transaction. The funds were not transferred from respondent's attorney trust account, however. The check was issued by the Skamania County Title Company of which respondent was manager.

3. Between January and November of 1977, respondent represented Mrs. Anderson in the sale of her cafe. The purchaser gave respondent $11,500 which was placed in the trust account. Periodic payments were made from the

account to Mrs. Anderson and her creditors. On March 30, 1977, respondent drew a check on his trust account for $100, payable to Mrs. Anderson. The account was, in fact, overdrawn by $822.25. In May 1977, respondent drew a check on his trust account for $440 payable to creditors of Mrs. Anderson. When the check was presented for payment, there was only $66.86 in the trust account. Two other checks drawn on the trust account, payable to the Department of Labor and Industries and the Internal Revenue Service, met with similar fate. Further, had Mrs. Anderson demanded the balance of her funds at any time, respondent would have been unable to pay her from the trust account.

4. In June of 1977, Mr. Hastings, respondent's client, closed a real estate transaction. The funds were placed in respondent's trust account. Thereafter, respondent drew a $915.79 check on the account payable to Hastings. At that time, the trust account had a balance of $25.23. On presentment, respondent found it necessary to cover the check from his personal account.

5. In June of 1977, respondent deposited $4,000 into his attorney's trust account on behalf of his client Elena Ternahan. In July, he issued a $2,000 check to her but made no further withdrawals. During July, August and September, respondent's trust account balance should have included the remaining $2,000 belonging to his client. However, on August 1, 1977, the trust account balance was only $1,259.45 and on September 1, 1977, it was a mere $36.40. During this period of time, respondent would have been unable to satisfy the $2,000 trust obligation to his client.

6. On June 28, 1977, respondent received a $7,250 cashier's check payable to Mr. Slaughter, his client. Respondent endorsed Slaughter's name thereon and deposited the funds in his attorney's trust account. The money was not paid to Mr. Slaughter until he demanded it in September. In the intervening period of time, respondent would have been unable to pay Mr. Slaughter from the depleted trust account.

7. From the fall of 1976 through December 1977, respondent made a regular practice of withdrawing funds from his attorney's trust account for his own personal use and, on two occasions, for the use of his wife. On other occasions, he made telephonic transfers of funds from the trust account to his own personal checking account. Respondent did not maintain a record to show which client's account was being drawn against or to document his personal entitlement to any of the funds. As the unchallenged findings of fact explain:

> That during the period . . . [respondent] routinely used funds of one client to satisfy both his personal obligations as well as the financial obligations owing to his other clients.

Finding of fact No. 40. If requested to do so during this period, respondent would have been unable to pay any client his or her funds from his trust account.

Ultimately none of respondent's clients sustained a loss of funds. However, Mr. Richards' trust funds, reported in the first incident above, were not repaid until after the Bar Association acted upon the complaint.

To refer to the foregoing series of defalcations as a mere wrongful conversion of clients' trust funds would be overly charitable. A correct assessment of the seven incidents would be a series of criminal defalcations as defined by RCW 9A.56.010–.030.

After the standard disciplinary proceedings, both the hearings officer and the Disciplinary Board of the Washington State Bar Association recommended respondent be disbarred. This court received the matter on review and the majority now rejects the recommendation of disbarment. Instead, the majority imposes a sanction of 2 years' suspension from the practice of law. I cannot agree with this disposition.

The majority concedes the violations are extremely serious both in nature and number. It admits the hearings officer was justified in finding respondent's violations were

aggravated by their serious nature, potential consequences and frequent occurrence over an extended period of time. The majority even notes that respondent knew his conduct was improper and that he did not desist until the Bar began its investigation. Nevertheless, it concludes certain mitigating circumstances call for leniency.

The mitigating circumstances given considerable weight are: (1) the fact that respondent had received no prior Bar discipline and bore a local reputation inconsistent with the conduct that led to this disciplinary action; (2) the fact his clients suffered no financial loss; (3) respondent's cooperation with the Bar during the disciplinary investigation and his apparent contrition during the proceedings; (4) the support and confidence of his associates despite the widely known information of mishandled funds; and (5) the fact that the Disciplinary Board felt *Kumbera* had caused confusion about the impact of our prior cases on the subject of trust account violations. I shall discuss each factor separately below.

## I
### ABSENCE OF PRIOR BAR DISCIPLINE

In the past this court has made it abundantly clear that the invasion of a client's trust funds cannot be "condoned, justified, or rationalized, whatever the personal urgency of the moment may appear to be, *or however faithful to his trust an attorney has been in the past.*" (Italics mine.) *In re Cary*, 90 Wn.2d 762, 765, 585 P.2d 1161 (1978). Our most recent decision touching upon the subject cites *Cary* with approval. *In re Zderic, supra* at 787-88. Thus, until now, the lack of prior Bar discipline was not considered a mitigating factor.

## II
### NO ULTIMATE LOSS SUFFERED BY THE CLIENTS

Heretofore, we have held that although funds repaid to a client may relieve a lawyer of civil liability, it does not mitigate the violation of his obligation as a lawyer. *In re*

*Grant,* 4 Wn.2d 617, 622, 104 P.2d 602 (1940). "[R]estitution and repentance following such violations, while commendable, do not constitute a defense". *In re Pennington,* 73 Wn.2d 601, 606, 440 P.2d 175 (1968); *In re Cary, supra.* The repayment of money fraudulently used neither purges the lawyer of the offense nor does it establish that he has become a person fit to be trusted or fit to practice law. *In re Grant, supra; In re Gowan,* 104 Wash. 166, 176 P. 7 (1918). I recognize the above cited cases are not recent. Nevertheless, the passage of time has neither changed the duty of the lawyer to his client, human character nor common sense.

## III
### COOPERATION AND CONTRITENESS OF RESPONDENT

The fact that respondent was cooperative with the Bar during its investigation should not have a bearing upon the mitigation of the numerous offenses. It was to his advantage to cooperate fully. Moreover, had he refused, it would have been another violation of the Code of Professional Responsibility subjecting him to further disciplinary action under DRA 1.1(i) and (j) as a willful violation of DRA 2.5. *Accord, In re Robinson,* 89 Wn.2d 519, 520, 573 P.2d 784 (1978). Further, we have noted on other occasions that repentance and contrition following the violation of an ethical duty, while commendable, do not constitute a defense and hardly mitigate the offense. *In re Zderic,* 92 Wn.2d 777, 600 P.2d 1297 (1979); *In re Cary, supra; In re Pennington, supra.*

## IV
### CONFIDENCE OF LOCAL ASSOCIATES DESPITE
### MISHANDLING OF FUNDS

This, as with the previous factor, is legally not a mitigating factor. It may be a personal consideration for one who attempts to start a new life in his old community. It is not relevant, however, in determining the severity of discipline to be imposed upon one who has committed a serious violation of the Code of Professional Responsibility.

Even if viewed only from a factual or judgmental standpoint, the extent of claimed local confidence is questionable. It is true several of respondent's former clients expressed confidence in him. It is equally clear, however, that he did not enjoy such a feeling of confidence among all of his victimized clients. Further, the majority has overlooked the fact that for years respondent had been both a customer and a director of the bank in which he placed his attorney's trust account. During the period respondent was invading and overdrawing that account, the bank examiner raised a serious objection which culminated in his resignation as a director of the bank.[1] It is of interest that despite this series of events leading to his resignation in May of 1977, respondent continued his practice of invading the funds of clients supposedly held safely in his attorney's trust account.

With these matters in mind, this court's concern should not focus on how well he might be accepted by a few former clients, friends and neighbors. We should be concerned with a much heavier burden that is placed upon our shoulders as members of this court. We must be ready to assure a trusting community that respondent will be a thoroughly trustworthy lawyer in the future. As we stated in *In re Cary, supra* at 766–67, citing *In re Ward,* 54 Wn.2d 593, 601, 343 P.2d 872 (1959) and quoting from *In re Beakley,* 6 Wn.2d 410, 107 P.2d 1097 (1940), the question each justice of this court must now answer is:

---

[1]In a letter to the Board of Directors of the Columbia Gorge Bank the State Supervisor of Banking had this to say, in part, about respondent's overdrafts:

"The Federal Deposit Insurance Corporation has forwarded to you their report of examination of March 18, 1977, with Examiner Robert D. Ecoff in charge.

"It was again noted that Director Salvesen has been overdrawn on numerous occasions. Your reply letter of November 2, 1976, to our examination indicated that Director Salvesen had agreed this practice would cease. Such has not been the case. This could be construed to be a flagrant and willful disregard for the State's banking laws and examiner recommendations, and therefore, any further abuse or disregard in this area may subject the bank and offender to penalties provided in RCW 30.04.050 and RCW 30.04.310. Please indicate specifically what action was taken to preclude recurrence."

"Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney?"

I cannot, in good conscience, answer that question in the affirmative.

Few duties placed upon the lawyer are more fundamental, more clearly defined, more easily followed and more necessary to promote public trust and confidence in the legal profession than the absolute inviolability of an attorney's trust account. *In re Pennington, supra.* Nevertheless, respondent made a conscious choice to violate that trust. How can we now hold him out to the public as worthy of the confidence which a client is compelled to repose in his lawyer?

## V

### CONFUSION CAUSED BY *KUMBERA*

The majority apparently concludes the Disciplinary Board qualified its recommendation of disbarment. I disagree. A 7-to-1 vote for disbarment is not qualified in any way!

While the Board sent a subsequent letter concerning respondent, it did not qualify its earlier recommendation of disbarment. The letter was no more than an expression of confusion over how this court could apply the long-standing view of *In re Cary, supra* at 766 (*i.e.*, that "the basic and underlying purposes of discipline are protection of the public and preservation of confidence in the legal profession as well as the judicial system")[2] in light of this court's seemingly inconsistent, more subjective and oversolicitous view of its role in lawyer discipline recited in *In re Kumbera*, 91 Wn.2d 401, 588 P.2d 1167 (1979). In effect, the

---

[2]The principle has been adhered to for at least the past 26 years as expressed in *In re Krogh*, 85 Wn.2d 462, 536 P.2d 578 (1975) and *In re Smith*, 83 Wn.2d 659, 521 P.2d 212 (1974); *In re Greenlee*, 82 Wn.2d 390, 510 P.2d 1120 (1973); *In re Hawkins*, 81 Wn.2d 504, 503 P.2d 95 (1972); *In re Steinberg*, 44 Wn.2d 707, 269 P.2d 970 (1954).

letter merely states that the Bar has always believed that preservation of confidence in the legal profession and the judicial system and public protection were basic to lawyer discipline. But, it goes on to say, if this court chooses to abandon those basic principles for a lesser standard, as it appeared to do in *Kumbera,* then respondent should benefit by the reduced ethical standards. The Board reiterated its confusion over the abandonment of the basic principles of lawyer discipline and requested clarification and guidance. For the Bar to suggest respondent should get the benefit of a newly weakened ethical principle is quite different from saying it recommended (qualified or otherwise) that respondent should not be disbarred.

I can fully understand the Bar's confusion and consternation over the apparent rejection of this court's long–standing recognition of its basic duty to the public, the legal profession and the judicial system. The confusion is even heightened by our action subsequent to *Kumbera.* In *In re Zderic, supra* at 787–88, we restated *In re Cary's* more responsible statement of the judicial role. I can only say that the instant case is a good example of the overly subjective, overly solicitous approach initiated in *Kumbera.* Following, as it does, the long–standing *Cary* approach, interrupted by *Kumbera,* thence followed by a return to the strict approach in *Zderic,* lawyers, the Disciplinary Board and interested members of the public must feel as if they are observing an intellectual yo–yo.

I cannot condone an abandonment of the more strict recognition of our duty to the public, the legal profession and the judicial system itself. At best it adds a spot of dry–rot to the legal structure.

Finally, I must observe that for years this court has consistently held that in making the ultimate determination as to the measure of disciplinary action, we will give consideration to the following matters: (1) the seriousness and circumstances of the offense, (2) avoidance of repetition by the offender, (3) the sanctions' likely deterrent effect upon others, (4) maintenance of respect for the honor and dignity

of the legal profession, and (5) assurance that those who seek legal services will be insulated from unprofessional conduct. *In re Zderic, supra; In re Kumbera, supra; In re Livesey,* 85 Wn.2d 189, 532 P.2d 274 (1975); *In re Smith, supra.* The majority has not even paid lip service to these principles. The opinion has down-played the actual seriousness of the individual offenses set out at length in this dissent. It has ignored the fact that sanctions should be employed so as to have a deterrent effect on others. Instead of considering the series of serious offenses, however, the majority has imposed a penalty that virtually invites others to victimize clients with the expectation that they need only repay the stolen funds if caught, remembering, of course, to act contrite and express their sorrow.

The majority also has overlooked the requirement that a sanction should be sufficient to permit the public to maintain respect for the honor and dignity of the legal profession. This decision gives no assurance to a vulnerable public that those who seek legal services will be insulated from unprofessional conduct. This decision will not impress the public favorably.

Instead of upholding the welfare of the Bar as a whole, instead of considering those individual lawyers who honorably serve the public, and, instead of protecting the welfare of the public at large, the majority has directed its solicitude toward the individual miscreant. In so doing, it has turned former principles governing lawyer discipline on their heads by focusing only upon a small segment of the disciplinary picture to the near exclusion of the larger and more important consideration of the public, the legal profession and the Bar.

For the reasons stated above, I dissent and would disbar respondent.

WRIGHT and BRACHTENBACH, JJ., and HAMILTON, J. Pro Tem., concur with STAFFORD, J.