[No. C. D. 2022. *En Banc.* October 31, 1957.]

*In the Matter of Disciplinary Proceedings Against* RALPH E. PURVIS, *an Attorney at Law.*[1]

*T. M. Royce*, for board of governors.

*Brodie & Fristoe*, for respondent.

[1] Reported in 316 P (2d) 1081.

DONWORTH, J.—The Washington state bar association, by its complaint, verified by its president, charged respondent, Ralph E. Purvis, with violation of his oath and duties as an attorney at law and of the ethics of the profession. No specific canon of ethics nor ground for disciplinary action (Rule for Discipline of Attorneys 10, 34A Wn. (2d) 183) is referred to in the complaint. Respondent, as a member of the bar of this court, has engaged in the practice of law at Bremerton since 1934. The nature of the transactions involved, and respondent's connection with them, will be fully described below.

After being served with the complaint, respondent filed his answer and the matter was referred to a trial committee for hearing.

At the hearing, which was held at Port Orchard on August 3, 1955, respondent appeared *pro se.* Testimony was taken and documentary evidence introduced. Thereafter, the trial committee made certain findings and recommended to the board of governors that respondent be suspended from the practice of law for one year. Respondent filed a statement in opposition to the findings and recommendation, in which he requested a hearing *de novo* before the board of governors.

The board of governors examined the record in this matter and the report of the trial committee. The board considered and denied respondent's request for a hearing *de novo*. The board approved the findings and recommendation of the trial committee and recommended to this court that respondent be suspended from the practice of law for one year.

Respondent obtained counsel prior to the time the record was filed in this court on November 1, 1955. Thereafter, respondent filed a motion to remand this matter to the board of governors for the purpose of taking the testimony of Dr. Grant E. Parsons. After argument, the motion was granted by this court on February 17, 1956.

On April 17, 1956, the trial committee held another hearing, at which respondent was present and was represented

by counsel. At this hearing, the trial committee heard the testimony of Dr. Parsons (and that of Richard M. Thatcher, counsel for DeGroot in his suit against Big Beef Farm, Inc., hereinafter referred to), and thereafter submitted to the board of governors amended findings and recommendations. The recommendation of a majority of the committee was the same as that previously made. One member of the committee concurred in the findings, saying:

"I concur in the foregoing findings of fact and conclusions but do not concur in the recommendation. I feel that the disciplinary action should be fixed by the Board of Governors in this case."

Respondent filed with the board a statement in opposition to these amended recommendations and again asked for a hearing *de novo* before the board. This request was not granted.

On April 2, 1957, the board of governors filed in this court a supplemental report and recommendation, reading, in part, as follows:

"The board made a study of the record, including the additional evidence, and the amended findings and recommendation of the trial committee. The board approved the amended findings, and approved the recommendation made by the majority of the trial committee, and the board recommends that Mr. Purvis be suspended from the practice of law for one year."

It was stipulated that the briefs already on file and the objections previously filed by respondent should apply to the board's supplemental report and recommendation without the necessity of preparing additional briefs or objections.

On May 8, 1957, the matter was heard by this court sitting *En Banc.* At this hearing, respondent was represented by counsel, and the board appeared by its counsel.

The basic facts are not disputed. In order to determine the propriety of respondent's conduct in the premises, and to decide whether the board's recommendation should be approved, we deem it necessary to state the facts in more

detail in this opinion than they are set out in the trial committee's findings.

The acts and omissions for which complaint is made arise out of various conveyances and transfers of real property, or interests therein, and are described as follows:

Dr. Donald W. Anderson and his wife were, in 1945, the owners of a certain tract of land situated in the Big Beef valley, near Seabeck, in Kitsap county. On July 15, 1945, the Andersons entered into a real-estate instalment contract with Nina B. Paulson, wherein the latter, as vendee, agreed to buy, and the Andersons, as vendors, agreed to sell the property. The purchase price as recited in the contract was $10,500, of which the sum of $2,500 was paid in cash upon execution of the contract, and the balance of $8,000 was to be paid at the rate of fifty *or more* dollars per month, beginning August 15, 1945, and continuing every month thereafter until the balance of the purchase price plus interest thereon at the rate of five per cent per annum (which was to be included in the monthly payments) was fully paid. The contract was filed for record August 17, 1945. The evidence does not disclose whether Miss Paulson ever took actual possession of the property, but the trial committee found that at all times relevant to these proceedings she was residing in California.

W. W. Wade, the instigator of these proceedings, learned from Miss Paulson that she was desirous of selling her interest in the contract. Mr. Wade then contacted respondent —who had theretofore performed certain minor legal services for him—for advice as to the status of the Anderson-Paulson contract. By letter of October 19, 1951, respondent informed Wade as follows:

"In connection with the property owned by Dr. Anderson and located at Big Beef, which is being purchased under contract by Nina B. Paulson, I am informed that the original contract price was $10,500.00, of which $2500.00 was paid down and the contract calls for payments of $50.00 or more per month, including interest at the rate of 5% per annum. The contract is filed in Volume 391 of Deeds, page 344, records of the Auditor of Kitsap County, and is dated July 15, 1945.

"The contract does not contain any provisions preventing its assignment and contains no clause therein preventing the removal of timber.

"I trust this is the information you desire in connection with this matter."

Wade testified that, pursuant to this communication, he transmitted to Miss Paulson the offer of Irving DeGroot, a logger and friend of long standing, to purchase the timber for $3,000 and asked that she take it up with Dr. Anderson. Wade further testified that Miss Paulson reported that Dr. Anderson refused to permit her to sell the timber, whereupon Wade said to DeGroot, "Let's you and I buy it [the contract] then," to which DeGroot replied that he was not interested in the land but that he would give $3,000 for the timber and Wade could take the land. DeGroot was an experienced timber buyer and had previously acquired standing timber from Wade without any writing whatsoever.

Thereafter, and apparently sometime shortly before the third of December, 1951, Wade again contacted respondent, probably by telephone. (Wade testified he had never visited respondent's office.) Respondent was advised of the contemplated transactions, and it was requested that he prepare the necessary papers. Respondent prepared a document entitled "Deed and Purchaser's Assignment of Real Estate Contract," by which Nina Paulson conveyed to Wade and his wife her vendee's interest in the executory contract for the sale of the real property. The day of the month in December, 1951, when it was executed was left blank in the instrument, but the assignment was acknowledged by Miss Paulson in California on December 3, 1951, and filed for record in Kitsap county on January 8, 1952.

The consideration which supported the Paulson to Wade assignment approximated $3,600, $3,000 of which was supplied by DeGroot, who issued his personal check, payable to W. W. Wade, in that amount. Wade in turn endorsed the check, payable only to respondent, who deposited the same in his office account and made disbursements to Miss Paulson and also to Dr. Anderson in order to put the contract in current good standing, since it had theretofore been in de-

fault and was subject to forfeiture. This balance of approximately $600 was paid directly by Wade to respondent.

As part of the same transaction, respondent, at the request of Wade, prepared a document entitled "Agreement" between Wade and his wife and Irving DeGroot, which, omitting the formal portion and the property description, reads as follows:

"WHEREAS, parties of the first part are purchasing under contract certain property located in the County of Kitsap, State of Washington, more particularly described as follows: . . . [property description omitted.]

"WHEREAS, the parties hereto are desirous of executing a contract for the cutting and removal of certain timber from the above described property by party of the second part,

"Now, THEREFORE, in consideration of the mutual covenants herein contained, and the sum of Three Thousand ($3,000.00) Dollars paid to parties of the first part by party of the second part, receipt of which is hereby acknowledged, it is agreed between the parties hereto as follows:

"1. Parties of the first part by these presents have sold and conveyed to party of the second part all of the merchantable timber of every species, except alder, located upon the above described property; provided that the parties of the first part do reserve unto themselves all alder timber located upon all of the above described property and all timber located on the floor of the Big Beef Creek Valley running across said above described property, which reserved timber the party of the second part shall not cut and remove.

"2. Party of the second part shall cut and remove said timber from said property within a period of three (3) years from the date hereof.

"3. Party of the second part shall comply with all regulations of the Washington State Forestry Department.

"4. Party of the second part shall have the right to construct and build access roads on said property for the purpose of removing said timber and shall have the right to use said roads for a period of three (3) years from the date hereof.

"5. Party of the second part shall improve the existing road on said property which leads from the public highway to the residence dwelling located on said property, so as to make the same passable.

"6. Party of the first part warrants that they have the right to execute this contract for the sale of said timber, and in the event the contract vendor of said parties of the first part should attempt to prohibit the party of the second part from cutting and removing said timber, parties of the first part shall indemnify and hold harmless party of the second part."

It is to be noted that this agreement does not contain any form for notarial acknowledgment. The agreement was unsigned and unacknowledged by anyone at the time it was delivered by respondent to Mr. Wade, either by mail or by personal delivery directly to Mr. Wade at his home.

According to Wade's testimony, it was signed by him "a week or ten days" after it was left by respondent. Mr. DeGroot was present. In his wife's absence, and without her permission, Wade subscribed her initials immediately above the line reserved for the signature of the party of the second part. DeGroot then accepted the agreement, which was never acknowledged nor recorded.

Respondent, on cross-examination of Wade, sought to elicit that Wade had told him when the agreement was prepared that his (Wade's) wife would never sign it. Wade denied so stating. Later respondent, while testifying in his own behalf, said that Wade had so stated.

On cross-examination of Wade, respondent also attempted to show that the inclusion of paragraph six in the agreement tended to indicate that Wade had previously been advised by respondent that Dr. Anderson could at any time prevent the removal of timber by DeGroot. Wade testified that the purpose of the clause was to protect DeGroot, but hedged on giving a direct answer.

Irving DeGroot testified that respondent had represented him on three prior occasions; that he (DeGroot) was in the office of respondent during the preparation of the "Agreement" and that he "went over the description—legal description of the property with him." He stated the document looked like an ordinary timber deed and that he did not notice the absence of an acknowledgment; that he did not know that an acknowledgment was necessary; and

that he relied upon respondent. DeGroot denied respondent's ever discussing with him the necessity of Mrs. Wade's signature on the instrument and said in fact that he thought the signature (whether he meant Wade's signature, or the initials subscribed by Wade in his wife's absence, is not clear) was hers.

Wade testified that respondent and Dr. Grant E. Parsons wanted to go in with him and form a corporation for the development of the property. This is directly controverted by the testimony of Dr. Parsons to the effect that it was Wade, not respondent, nor himself, who suggested that they form a corporation for the purpose of developing the land. Parsons further testified that the solicitation by Wade continued over a period of several months prior to the incorporation of Big Beef Farm, Inc., and that, in fact, he (Dr. Parsons) became interested only after he discovered that respondent also was interested and became a member of the triumvirate only upon the condition that respondent also joined. This testimony is substantially supported by that of the respondent, except that the testimony of the latter is not as broad.

In December, 1952, Wade, Parsons, and respondent, as incorporators, sole stockholders, and directors, incorporated the Big Beef Farm, Inc. Parsons and respondent each subscribed for a like amount (fifty shares) of stock and each paid the sum of five thousand dollars therefor. As directors, the parties elected themselves to the following corporate offices: Wade, president; Parsons, vice-president; and respondent, secretary-treasurer. Respondent prepared the necessary legal papers. Wade assigned to the corporation the vendee's interest which he and his spouse then owned in the executory contract for the purchase of the real property in full payment for fifty shares of stock having a par value of one hundred dollars per share. Respondent prepared a deed and assignment of the vendee's interest in the contract from Wade and his wife to the corporation. This was subsequently properly signed and acknowledged by them and filed for record. The document contained no refer-

ence to the agreement of December, 1951, between DeGroot and Wade.

The bylaws of the corporation provided that no notice of regular monthly meetings of the corporation's board of directors was necessary.

Finding No. 9 of the trial committee describes the conduct of the stockholders in 1953 and early 1954 as follows:

"That between January, 1953 and April, 1954 extreme bitterness and animus existed between Wade on the one side and the respondent and Dr. Parsons on the other, which animus and bitterness was increased by dissension over contemplated sales of personal property belonging to the corporation (respondent and Parsons desiring to sell and Wade objecting thereto) and said animus and bitterness resulted in and was increased by the institution of litigation in replevin by the corporation (through respondent and Dr. Parsons against Wade) for the recovery of personal property belonging to the corporation and in Wade's possession, which litigation resulted in a judgment in favor of the corporation and against Wade, requiring the delivery of certain corporation personal property by Wade to the corporation, and adjudging Wade liable for costs."

Both Parsons and respondent requested Wade to persuade DeGroot to convey whatever interest he had acquired in the timber under the "Agreement," to the corporation for the sum of $3,000 (which was the sum he had paid for it), plus interest. DeGroot declined the offer and sought an extension of the time within which he could cut and remove the timber under the contract. Dr. Parsons, who had actual notice of the DeGroot interest prior to the incorporation (and said that he was advised by respondent that he "doubted that DeGroot's contract was sound or firm"), testified that he was not disposed to grant an extension without some additional consideration. In any event, Wade sided with DeGroot, attempting to procure an extension of the cutting and removal time under the De-Groot agreement, while Parsons and respondent united in attempting to acquire the DeGroot interest.

The efforts of the parties to reconcile their disputes apparently expired on April 5, 1954, prior to which time De-

Groot refused $3,000, plus interest, offered by the corporation and demanded, instead, the payment of $10,000. This demand was not acceptable. At that time, DeGroot could not start logging because he could not obtain a cutting permit without Dr. Anderson's consent, which both he and Wade knew was unobtainable. Less than nine months then remained within which to remove the timber under the agreement.

Prior thereto, respondent had met Oscar Ramsey, a logger who also owned a machine shop. Ramsey had, at the request of respondent, constructed a cultivator for respondent, and the latter went to Ramsey's shop to take delivery thereof. A general discussion of the logging business ensued, during which Ramsey stated that good timber was becoming hard to find and that he was interested in buying. Respondent mentioned that he had timber for sale at Seabeck and asked if Ramsey would care to look at it. Ramsey did visit the property with respondent shortly thereafter, where they discussed the purchase of the timber. He decided to buy.

A regular meeting of the board of directors was held in the office of respondent on April 7, 1954, at the time stated in the bylaws, without notice to Mr. Wade, who was unequivocally opposed to a sale of the property on the ground that the timber had already been sold to DeGroot. At this time Parsons and respondent, constituting a majority of the board of directors, approved the sale of all timber rights in the property to Ramsey, and entered a notation to that effect in the corporate minutes of that date.

Ramsey's testimony before the trial committee consisted of the reading of his pretrial discovery deposition in the case of DeGroot v. Big Beef Farm, Inc. (cause No. 33524) in the superior court for Kitsap county, which is referred to below.

By "Timber Deed and Agreement," dated April 7, 1954, and executed on behalf of the corporation by Parsons as vice-president and respondent as secretary, Ramsey acquired "all of the timber located upon the real property," and was allowed fifteen years in which to cut and remove

the timber. This document, which was prepared by respondent, was executed by both the corporation and by Ramsey and his wife. It contained notarial acknowledgments of both the grantor and grantee, and was subsequently filed for record in Kitsap county on April 9, 1954.

As a part of the same transaction, and as evidenced by recitals in the timber deed and agreement of April 7th, Ramsey and his wife acquired from Dr. Anderson and wife, the vendors, their interest under the executory contract by taking a "Deed and Seller's Assignment of Real Estate Contract" from them upon payment of $5,542.37, which was the balance then owing to the Andersons from the corporation, as vendee thereunder. The Andersons acknowledged the instrument on April 6, 1954, and it was filed for record in Kitsap county on April 8, 1954.

By the terms of the timber deed, it was agreed between Ramsey and the corporation that all monthly payments on the principal balance ($5,542.37) were suspended and that interest on the principal sum would not thereafter accrue. Ramsey agreed to apply (toward the liquidation of the aforesaid balance) an amount equal to twenty-five per cent of the net sale price of the timber after severance, received by him, until such time as that balance would be satisfied by the application of such proceeds. (Certain other minor emoluments in favor of the corporation were also provided.) Ramsey further agreed that, upon liquidation of the indebtedness in the manner provided, he would execute and deliver to the corporation a quitclaim deed to the real property and would thereafter pay cash to the corporation on the same basis for all timber subsequently removed and sold.

On May 19, 1954, DeGroot and his wife instituted an action in the superior court for Kitsap county (cause No. 33524) for the purpose of quieting title to the timber on the property, basing their claim of ownership on the agreement of December, 1951, with Wade. As a second cause of action, the DeGroots sought judgment against the respondent and his marital community and against Parsons and his marital community for attorney fees incurred in quiet-

ing title, alleging fraud and connivance on the part of Parsons and respondent. The defendants named in the complaint were Big Beef Farm, Inc., Ramsey, Wade, and Parsons, and their respective wives, and respondent and his wife.

After trial upon the merits, the trial judge announced that he would quiet title in the Ramseys as bona fide purchasers of the timber without notice of the claim of interest of the DeGroots, and asked if the parties might get together and settle the remainder of their disputes. As a result of this suggestion, the DeGroots executed their release of all claims against the corporation and against all individual parties, and their marital communities (including Wade and wife), in consideration of the payment of $4,500. This sum was borrowed by the corporation at a bank, the note being endorsed personally by Parsons and respondent.

The net result of these rather complicated transactions was:

1. DeGroot received back the $3,000 which he had paid Wade for the timber deed, plus $1,500. After payment of the expenses of his suit against Big Beef Farm, Inc., *et al.*, he had approximately $3,700. This gave him about $700 net return on three years' use of the $3,000 which he had paid to Wade.

2. Wade was relieved of any claim of DeGroot against him on account of the timber deed. Also, Wade obtained, for approximately $1,200, plus certain labor  (and still owns) one third of the stock of Big Beef Farm, Inc. (Wade in his testimony claimed that he caused the property to be improved by work "in the way of bulldozing and pipe and all those things and putting in the fish pond." He estimated this to be worth $5,000 or $6,000, but failed to support this valuation with any convincing evidence.)  Respondent and Dr. Parsons had each paid $5,000 for an equal amount of stock.

3. Respondent personally endorsed the corporation's note to the bank for the $4,500 which it was necessary to borrow in order to pay for DeGroot's release of his claims against

all of the parties to the litigation (including Wade). Respondent has since sold his stock in the corporation to Dr. Parsons at a loss of $1,500. Wade testified that Dr. Parsons had relieved respondent from liability on the corporate note.

Consequently, Wade (who instigated these proceedings) has profited materially while respondent has sustained a substantial loss.

Wade contended that inevitably he would sustain a loss. His conclusion does not appear to be supported by the facts. Since the corporation was primarily liable to the bank on its note for $4,500 (which sum was used to obtain DeGroot's release), Wade, as owner of one third of all stock in the corporation, stood only to lose a one-third proportionate share of whatever deficiency remained should the removal of the timber by Ramsey fail to yield $4,500. But the fact that Ramsey, an experienced logger and timber buyer, paid in excess of $5,500 to acquire the vendor's interest in the contract from the Andersons tends to negate Wade's contemplated potential loss.

In considering this matter, it is proper to have in mind the source of the complaint made against respondent. Wade was the only person who complained to the Washington state bar association about respondent's conduct. His only apparent motive was to obtain revenge for having lost a replevin suit brought by respondent on behalf of Big Beef Farm, Inc., against Wade for wrongfully withholding possession of certain personal property belonging to the corporation (see finding No. 9 above quoted). Wade made threats of physical violence against respondent and had previously told respondent's wife that if respondent did not vote with him in directors' meetings regarding the sale of personal property, he (Wade) would have him disbarred. At the hearing before the trial committee, Wade testified, on cross-examination, as follows:

"Q. [by respondent] Did you threaten to hit me? A. Yes, and I would do it now if you wanted to go outside!"

After the second hearing of this matter, the trial commit-

tee entered amended findings of fact. In his written statement in opposition to these findings and application to the board of governors for hearing *de novo,* respondent stated:

"That respondent is now the Democratic nominee for the State Senate from the Twenty-third District. That the complainant, W. W. Wade, during the past few weeks, has been displaying to many of the voters in the Twenty-third District a copy of the original findings and recommendations of the trial committee in this disciplinary proceeding and has been telling clients and friends of respondent that respondent has been disbarred. That the said complainant, W. W. Wade, should be required to attend the re-hearing De Novo and explain his actions in slandering the reputation of respondent before there has been a final determination of this proceeding."

A copy of this statement was transmitted by mail on October 23, 1956, to Wade. The record before us wholly fails to show any denial by Wade of the accusations therein made.

■ In *State ex rel. Dill v. Martin,* 45 Wash. 76, 87 Pac. 1054 (1906), this court, in discussing the rule that, in disbarment proceedings, costs would not be taxed to either party, in the absence of an express statute on the subject, said:

"Such a rule, we believe, is wholesome, and will tend to prevent the hasty and ill-considered initiation of disbarment proceedings, which may not be prompted altogether by a desire to serve the public good. *Such proceedings should be prompted by the sole and pure desire to serve the public good,* and not for the purpose of serving any private end." (Italics ours.)

■ It is obvious from the record that Wade's activities in causing this proceeding to be instituted and prosecuted were motivated entirely by personal enmity and a desire for revenge, and not for the purpose approved in the above-quoted statement of this court. While this fact would not absolve respondent of blame for any improper conduct, it is proper for us to consider this factor, among others, when determining what disciplinary action should be taken in this case.

We now consider precisely what respondent did—or failed to do—which could be said to constitute acts of misconduct justifying the following conclusions of the trial committee (approved by the board of governors).

"From the foregoing findings of fact the committee concludes that the respondent engaged in actions whereby, for his personal benefit and gain, he abused and took advantage of confidence reposed in him by his clients, and that the respondent did not, in connection with the matters and things herein referred to, strive to uphold and maintain the honor and dignity of the profession, and that the acts of respondent as herein set forth were acts of corruption involving moral turpitude, all in violation of the Canons of Professional Ethics."

As stated in the beginning of this opinion, our attention has not been invited to any specific canon of ethics or duty of respondent, as an attorney, deemed by the trial committee and the board of governors to have been violated by respondent which would warrant disciplinary action under Rule for Discipline of Attorneys 10, 34A Wn. (2d) 183. This, unfortunately, has resulted in an unnecessarily extended opinion, requiring a detailed narration of incidents in order to determine whether any necessity exists for disciplinary measures within the purview of the twelve distinct subdivisions of Rule 10, *supra,* of which violation of the ethics of the profession is but one.

However, at the oral argument before this court, counsel for the Washington state bar association listed six acts of omission (which will be hereinafter discussed) on the part of respondent. It was argued that it was probable that no harm would have resulted from the conduct of respondent relative to the first three acts had respondent acted differently in relation to any one of the last three. The six alleged acts of omission charged to respondent, together with our views thereon, stated in parentheses, follow:

1. Failure to inform Wade that Dr. Anderson's consent was necessary to the removal of the timber. See letter of October 19, 1951, hereinabove quoted. (Prior to the consummation of the Paulson-Wade assignment, Wade had

actual knowledge that Dr. Anderson would not consent to the removal of the timber, having been so advised by Miss Paulson. In view of that actual knowledge, it is difficult for us to understand how Wade could have been misled by respondent's letter. DeGroot was not a client of respondent's in this matter, and had no right to rely on respondent for legal advice. Furthermore, DeGroot was protected by paragraph six of the Wade agreement from possible interference from Dr. Anderson.)

2. Failure to attach a notarial acknowledgment form to the timber agreement between Wade and DeGroot. (For the reasons stated in 32 Wash. L. Rev. 1, pp. 30-46, 1957, there appears to be a conflict of legal opinion as to the necessity for such an acknowledgment. In any event, the agreement was never signed by Mrs. Wade, so no notary could have functioned as to her.)

3. Failure to include in the assignment from Wade to the corporation a reference to the timber agreement between Wade and DeGroot. (Since all three incorporators and stockholders of the company had actual notice of the DeGroot agreement, no one else was concerned in this transaction. Furthermore, the only attorney-client relationship involved in this proceeding, i.e., that between respondent and Wade, had ceased to exist about a year prior to the incorporation. When respondent performed any acts for the corporation, he represented it as a director and stockholder.)

4. Failure to notify Wade of the meeting of the board of directors on April 7th. (Wade was the president of the corporation, and is therefore presumed to have notice of the provisions contained in its bylaws. But further, he had actual notice of the intention of his codirectors to sell certain assets of the corporation. From previous discussions, Wade knew that they favored selling, and they knew that Wade was violently opposed thereto. Wade and his two codirectors had tried to agree on a compromise of the DeGroot claim and had failed. It is reasonable to assume that the sale would have been authorized over his objection if Wade had been present at the meeting.)

5. Failure to tell Wade of the plan to sell to Ramsey. (This is similar to the preceding paragraph. Had respondent—or Parsons—told Wade of the plan to sell to Ramsey, Wade would have had the opportunity to advise Ramsey of the DeGroot contract and might possibly have delayed the sale. But the record fails to disclose that Ramsey would have acted differently had he been advised of the DeGroot agreement. In any event, a minority stockholder has no legal right to prevent the will of the majority from being carried out.)

6. Failure to tell Ramsey of the agreement between Wade and DeGroot. (At the time of the execution of the Wade-DeGroot agreement, Wade was respondent's client. Conceivably, respondent would have violated his oath and the 37th Canon of Professional Ethics, 34A Wn. (2d) 141, if he had disclosed to Ramsey any information concerning his client's (Wade's) transaction with DeGroot. In negotiating the sale with Ramsey, respondent was acting for the corporation. Ramsey was not his client.)

In analyzing the foregoing alleged omissions of respondent, the paramount factor to be considered is the relationship of the parties. Only in connection with the first two of the six omissions charged was respondent the attorney for Wade. At all other times he was the attorney for the corporation of which he was an officer, director, and stockholder.

Respondent profited from the first two omissions only to the extent of the use of a bulldozer loaned to him by Wade in payment for his services. With respect to the last four omissions alleged, he received no direct compensation from the corporation for his services as an attorney, but stood to profit only incidentally and proportionately with his two coshareholders in the corporation.

We fail to find any acts of respondent, in his attorney-client relationship, which were detrimental to the interests of his client. While it *may* be true that this action would not have been necessary had respondent acted differently, it is equally true that this action *might* not have been necessary had DeGroot employed his own attorney,

rather than take it upon himself to rely upon respondent, who was, at all times, representing adverse interests.

■ The object and purpose of disciplinary proceedings was stated by this court in *In re Steinberg,* 44 Wn. (2d) 707, 269 P. (2d) 970 (1954), as follows:

"Some regulation of the professional and personal lives of lawyers is necessary to preserve public confidence in the judicial institution and to protect the courts and public from misconduct."

■ In *In re Beakley,* 6 Wn. (2d) 410, 424, 107 P. (2d) 1097 (1940), we considered the purpose of such disciplinary actions to be as follows:

"Neither disbarment nor suspension is ordered for the purpose of punishment, but wholly for the protection of the public. When a matter such as this comes before the court, the question presented is not: What punishment should be inflicted on this man? The question presented to each of its judges is simply this: Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney?"

■ We hold that the evidence presented is insufficient to support the conclusions reached by the trial committee (and adopted by the board of governors). Hence, the recommendation of one year's suspension made by the board, which is based upon that conclusion, cannot be approved. We are of the opinion that grounds sufficient to warrant disciplinary action have not been shown to exist, and that this proceeding must be, and is hereby, dismissed.

HILL, C. J., MALLERY, WEAVER, ROSELLINI, and OTT, JJ., concur.

FINLEY and FOSTER, JJ., did not participate.