[No. C.D. 6705. En Banc. December 9, 1982.]

*In the Matter of the Disciplinary Proceeding Against* Thomas F. McGrath, Jr., *an Attorney at Law.*

*Robert T. Farrell,* for Bar Association.

*Murray B. Guterson,* for respondent.

BRACHTENBACH, C.J.—Following an argument in a restaurant lounge, attorney Thomas McGrath assaulted an individual with a gun, shooting and seriously wounding him.

About 4:30 p.m. McGrath had gone to a Kirkland restaurant and lounge. He was wearing a concealed gun holster which contained a loaded .38 caliber snub nose special. He later testified that he had no specific reason for carrying the gun that day, rather that he just carried it as he had on many other occasions. The shooting incident happened about 2 a.m.

During the course of the evening, McGrath discussed business with a client, discussed with another person a case he was handling, and talked to other persons about a condominium project. The rest of the evening was social.

McGrath's affidavit is the only rendition on the record of the events of that evening. According to his account, he was sitting at the bar at 1:15 a.m. when he and a stranger, the ultimate victim, became involved in a dispute. Strong words were exchanged, and the stranger offered to fight. McGrath suggested they resolve the matter outside, so the stranger and his friend left. McGrath stayed, hoping the others would leave and avoid a fight.

Upon leaving, he encountered the victim in the lobby. Another verbal exchange took place and the stranger slapped McGrath, open handed, on the face. McGrath went back into the restaurant and exited through the rear door. When he went outside he again encountered the stranger and his friend.

The stranger started toward McGrath, and McGrath told him to stop. When the stranger kept approaching, McGrath drew his gun and shot him. The bullet hit the victim in the neck and seriously injured him.

McGrath got in his car and drove away. Later, after calling his attorney, he turned himself in to the police.

McGrath was charged with two counts of assault in the

first degree. As a result of plea bargaining, he pleaded guilty to one count of assault in the second degree, a class B felony. McGrath was sentenced to 10 years' probation, to 1 year in the King County Jail on the work release program, to make restitution to the victim, and to pay $14,668.91 to the crime victims compensation fund. The work release jail sentence was later reduced to 10 months.

Thomas McGrath was admitted to the practice of law in the State of Washington in March 1970. Because of his felony conviction, this court suspended McGrath from the practice of law on December 10, 1980, pending the final disposition of the disciplinary proceedings against him. DRA 9.1. A formal complaint filed by the bar association charged that McGrath's conduct constituted a crime involving moral turpitude, thus warranting disbarment. DRA 1.1(a). A hearing was held before a hearing panel officer, who found that McGrath had engaged in conduct involving moral turpitude and recommended that he be disbarred. The Bar Association Disciplinary Board adopted the hearing panel officer's findings, conclusions and recommendations, with two members dissenting and recommending a 2–year suspension. We hold that McGrath's conduct did involve moral turpitude and that disbarment is the proper disciplinary sanction.

## I

■ The Discipline Rules for Attorneys state, in pertinent part:

> An attorney at law may be subjected to the disciplinary sanctions or actions set forth in Rule 1.2 for any of the following causes . . .:
> (a) The commission of any act involving moral turpitude, dishonesty, or corruption, whether the same be committed in the course of his or her conduct as an attorney, or otherwise, and whether the same constitutes a felony or misdemeanor or not; and if the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding shall not be a condition precedent to disciplinary action. Upon such conviction, however, the judgment and sentence shall be conclusive evidence at the

ensuing disciplinary hearing of the guilt of the respondent attorney of the crime described in the indictment or information, and of his or her violation of the statute upon which it is based. A disciplinary hearing as provided in Rule 3.2 of these rules shall be had to determine, (1) whether moral turpitude was in fact an element of the crime committed by the respondent attorney and, (2) the disciplinary action recommended to result therefrom.

DRA 1.1(a). In accordance with this rule, it is conclusively presumed that respondent McGrath is guilty of the crime of second degree assault. RCW 9A.36.020. For the purposes of a disciplinary proceeding, a plea of guilty will be treated the same as a jury verdict of guilty. *See In re Krogh,* 85 Wn.2d 462, 536 P.2d 578 (1975); *In re Johnson,* 74 Wn.2d 21, 442 P.2d 948 (1968); *In re Dalton,* 60 Wn.2d 726, 375 P.2d 258 (1962).

The first issue, then, is whether moral turpitude was an element of respondent McGrath's crime. McGrath was convicted of violating RCW 9A.36.020(b) and (c) which state that the crime of second degree assault is committed when one:

(b) Shall knowingly inflict grievous bodily harm upon another with or without a weapon; or
(c) Shall knowingly assault another with a weapon or other instrument or thing likely to produce bodily harm;
. . .

RCW 9A.36.020(b) and (c).

Counsel for the bar association has argued that a crime involving a "knowing" assault or a "knowing" infliction of bodily harm necessarily is a crime involving moral turpitude. Other courts have held, in immigrant deportation cases, that assault with a deadly weapon involves moral turpitude "beyond any question." *Weedin v. Tayokichi Yamada,* 4 F.2d 455, 457 (9th Cir. 1925); *United States ex rel. Zaffarano v. Corsi,* 63 F.2d 757, 758 (2d Cir. 1933). We decline, however, to adopt such a per se rule in the context of a disciplinary proceeding. Each case must be determined on its own facts. *In re Egger,* 86 Wn.2d 596, 598, 547 P.2d 864 (1976). In addition, the disciplinary rules

provide that, while a conviction is conclusive evidence of guilt, a hearing is necessary to determine if moral turpitude was involved. DRA 1.1(a). Thus, a finding of moral turpitude is a separate issue from the determination of guilt in a criminal proceeding. Moral turpitude must be determined from "the inherent immoral nature of the act, rather than from the degree of punishment which the statute law imposes". *In re Hopkins*, 54 Wash. 569, 572, 103 P. 805 (1909). To determine if moral turpitude is involved, the question to be answered is this:

> Now, do the acts found against the appellant, and for which he was convicted . . ., violate the commonly accepted standard of good morals, honesty, and justice? Suppose we measure his conduct in this regard, not by any puritanical standard, but by the standard of right conduct generally prevailing among our people, uninfluenced by the fact that the statute law also punishes such conduct as a crime. What, then, is the answer to the question whether or not such acts involve moral turpitude?

*In re Hopkins, supra* at 572.

This definition of moral turpitude is necessarily general. In the setting of attorney discipline, its application depends upon the collective conscience and judgment of the members of this court. It is as meaningful as other phrases adopted by other courts. *See Searcy v. State Bar*, 604 S.W.2d 256, 258 (Tex. Civ. App. 1980) which sets forth the various definitions. "Its definition does not gain in clarity by prolixity of statement." *In re Jacoby*, 74 Ohio App. 147, 155, 57 N.E.2d 932 (1943). *See also* 58 C.J.S. *Moral* 1200–07 (1948).

█ Applying the *Hopkins* standard, we find that McGrath's conduct involved moral turpitude for several reasons. First, it was an unjustifiable act of violence against another human being. Such violence has never been condoned under any legal system, ancient or modern. Second, while McGrath was licensed to carry a weapon, his carrying of a loaded pistol on many occasions and in situations where he had consumed considerable alcohol is not in

keeping with the prevailing standard of right conduct. As stated by the hearing panel officer, "the carrying of a loaded pistol is and was a psychological levanter which was a clear harbinger of the kind of event which took place on the evening on which Mr. McGrath's conviction is based." Furthermore, conviction of a crime with an intent element of "knowingly" is some evidence, although not conclusive, that moral turpitude was involved.

Respondent relies heavily on a California case, *In re Rothrock,* 16 Cal. 2d 449, 106 P.2d 907 (1940), where no moral turpitude was found in a disciplinary proceeding against an attorney convicted of assault with a deadly weapon. In *Rothrock,* however, the California court, after surveying other cases that dealt with the issue of moral turpitude with assault convictions, concluded that assault may or may not involve moral turpitude depending on the facts and circumstances involved. *In re Rothrock, supra* at 453–59. Given this premise, it necessarily follows that the *Rothrock* holding is limited to its facts and is not a persuasive precedent. Moreover, the facts in *Rothrock* are distinguishable: the applicable assault statute did not contain an intent element, the victim was not injured by the assault, and the sentence was light, only 2 months in the county jail. In contrast, this case involves a conviction for a degree of assault involving a "knowing" intent element, serious injury to a victim, and a sentence including 10 years probation and 1 year in the county jail. Thus, factual differences easily reconcile the different results in these two cases.

## II

Finding that McGrath's conduct involved moral turpitude, the second issue is the proper sanction to impose. The bar association hearing panel officer recommended disbarment and a majority of the Disciplinary Board adopted this recommendation. The recommendation of the Board is given "serious consideration," but this court retains ultimate responsibility for determining the proper measure of discipline in any given case. *In re Krogh,* 85 Wn.2d 462,

473, 536 P.2d 578 (1975).

As with the question of moral turpitude, the proper sanction is determined by the particular facts and circumstances of each case. There is no automatic felony disbarment rule in this state. *In re Krogh, supra.* Disciplinary sanctions are imposed to protect the public and to preserve confidence in the legal profession and the judicial system. *In re McNerthney,* 95 Wn.2d 38, 41, 621 P.2d 731 (1980). The factors to be considered are:

> (a) the seriousness and circumstances of the offense, (b) avoidance of repetition, (c) deterrent effect upon others, (d) maintenance of respect for the honor and dignity of the legal profession, and (e) assurance that those who seek legal services will be insulated from unprofessional conduct.

*In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974); *In re McNerthney, supra.*

The seriousness of this offense has already been discussed and is not in dispute. McGrath assaulted an individual with a loaded gun; he shot and seriously wounded him.

The second factor, avoidance of repetition, is difficult to evaluate. In this instance, where the crime is unrelated to the practice of law, the disciplinary sanction imposed by this court may not affect whether or not respondent will be involved in a similar incident in the future. Hopefully, the sanctions imposed by the Superior Court, which include abstention from alcohol, and McGrath's admission that he no longer carries a gun will suffice to preclude any repetition of this type of conduct by respondent.

Addressing the third factor, strict disciplinary sanctions here may serve as notice to other attorneys that this court demands a high degree of respect for the law from those who are members of the bar and officers of the court. While this is important, our decision does not rest on the deterrent factor alone.

The most persuasive factor in our decision to disbar respondent is the maintenance of respect for the honor and

dignity of the legal profession. An Ethical Consideration in the Code of Professional Responsibility states:

> Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

CPR EC 1–5. The Ethical Considerations are not mandatory in character, but they do represent principles that serve as guidance in enforcing the disciplinary rules. CPR Preliminary Statement.

■ While the record is replete with recitals of respondent's competency to practice law, this does not affect the grounds upon which our decision is based. *See In re Krogh*, 85 Wn.2d 462, 476, 536 P.2d 578 (1975). It is not necessary for the crime committed to be related to the practice of law to warrant severe sanctions. As pointed out by Henry S. Drinker, former chairman of the Standing Committee on Professional Ethics and Grievances of the American Bar Association, in his book *Legal Ethics*:

> [T]he cases dealing with the disbarment or other discipline of lawyers involve two distinct characteristics, although the distinction is often not clearly recognized:
>
> 1. Cases in which the lawyer's conduct has shown him to be one who cannot properly be trusted to advise and act for clients
>
> 2. Cases in which his conduct has been such that, to permit him to remain a member of the profession and to appear in court, would cast a serious reflection on the dignity of the court and on the reputation of the profession

(Footnote omitted.) H.S. Drinker, *Legal Ethics,* at 42–43 (1953).

This case falls into the latter category. As did the hearing officer, we find it repugnant to the basic standards of our legal profession to allow one who is serving a 10–year probation sentence for a felony conviction, for an act involving moral turpitude, to practice law and to represent clients in the courts of this state. McGrath's competence as an attor-

ney is not relevant to the question of whether permitting him to remain a member of the profession would cast a serious reflection on the dignity of the court and on the reputation of the profession.

Costs of $859.43 imposed by the Disciplinary Board are approved. The bar association has not filed a statement of additional expenses in the Supreme Court within the allotted time period, so these additional costs are deemed waived. DRA 7.2(a).

The recommendation of the Disciplinary Board is approved, and the respondent's name shall be stricken from the roll of attorneys in this state.

ROSELLINI, STAFFORD, DORE, and DIMMICK, JJ., concur.

WILLIAMS, J. (dissenting)—There can be no mistake that the actions of attorney Thomas F. McGrath, Jr., were wrong. Such behavior, especially by members of the bar, cannot be tolerated. Therefore, I agree that Mr. McGrath's conduct is deserving of disciplinary action by this court. I cannot agree, however, with the inflexible analysis of the majority which leads it to conclude disbarment is the only appropriate sanction. Accordingly, for the reasons set forth below, I dissent.

Thomas McGrath's conviction for assault in the second degree is a serious matter. It is, as the majority states, a crime involving moral turpitude. Yet, this incident appears to have been a crime of impulse, committed in the heat of an alcohol induced state. That is not to say Mr. McGrath's conduct is excusable, for it is not. The circumstances of this case, however, indicate to me the crime was a temporary behavioral aberration rather than a permanent moral failing. As such, I think disbarment is far too harsh. In my view, nothing will be gained by removing Thomas McGrath from the practice of law and, indeed, much may be lost.

The majority opinion employs the traditional analysis for determining the appropriate disciplinary sanction to be imposed. By using this method of determining the appro-

priate sanction, the majority arrives at its inevitable answer: disbarment. The validity of that answer is questionable, however, because several important pieces of information were omitted from the equation. Missing are any considerations of the positive attributes of Thomas McGrath or the individualized circumstances of this case. Apparently, the traditional analysis cannot accommodate such additional information. Since I believe the reasoning of the majority is overly simplistic and works an injustice here, I propose that our method of analysis itself must be changed. This can be accomplished by recognizing the qualitative differences between various crimes of moral turpitude and by acknowledging that attorney discipline is, at least in part, punishment. Instead of dispensing our harshest sanctions regardless of the circumstances, we could then mete out discipline more befitting of the case before us. The image of the legal profession would be better served if equality and proportionality of justice become our standard. The following would be my method of analyzing and dealing with this case.

## I
### MORAL TURPITUDE

I have no quarrel with the majority's determination that moral turpitude is involved in the crime of second degree assault, but the analysis cannot end there. My disagreement on this issue stems from the majority's failure to recognize that moral turpitude may be of differing types and degrees, depending on the nature of the act. Moral turpitude can be identified as a component of a wide variety of crimes, some more reprehensible than others. A crime involving moral turpitude committed spontaneously and without aforethought seems less condemnable to me than a crime committed after some degree of planning and consideration. To treat all crimes involving moral turpitude the same for purposes of attorney discipline cases may be simple and convenient, but it hardly reflects our stated principle of deciding each case on an individualized basis. *See In*

*re Egger,* 86 Wn.2d 596, 598, 547 P.2d 864 (1976).

Some crimes, like those involving dishonesty, are particularly incompatible with the practice of law. The legal profession concerns itself with a search for the truth in each case. A dishonest lawyer can disrupt the entire legal process by diverting the truthfinding function. In our most recent disciplinary case requiring disbarment for a felony conviction, *In re Stroh,* 97 Wn.2d 289, 295, 644 P.2d 1161 (1982), we noted that "the legal system is virtually defenseless against the united forces of a corrupt attorney and a perjured witness." That is the type of conduct, I submit, that deserves our severest sanction. To then equate such conduct that strikes at the heart of the legal profession with assault, a crime wholly unrelated to the practice of law, seems to me to be fundamentally unfair. Further, to focus single-mindedly on the existence or nonexistence of moral turpitude as the triggering device for severe attorney disciplinary sanctions makes it almost impossible to arrive at an appropriate decision.

Instead of simply looking to see whether moral turpitude is a component of a given crime and making that one factor dispositive of the entire case, I suggest we ask one further question: Does the crime charged relate to some important aspect of the practice of law? While there may be some crimes, like intentional homicide, which will warrant disbarment despite having little direct impact on the practice of law, I believe the above distinction is valid. Other courts apparently differentiate between crimes related or unrelated to the practice of law and, accordingly, impose different sanctions. *See In re Johnson,* 106 Ariz. 73, 471 P.2d 269 (1970); *In re Rothrock,* 16 Cal. 2d 449, 106 P.2d 907, 131 A.L.R. 226 (1940). *See also* Annot., *Homicide or Assault as Ground for Disciplinary Measures Against Attorney,* 21 A.L.R.3d 887 (1968). Since our function in attorney discipline cases is, among other things, to determine an individual attorney's fitness to continue practicing law, we should make our inquiries relevant to the task at hand.

To illustrate the point that the moral turpitude in this

case differs in kind from that previously warranting disbarment, one need only look to our past cases. In each of the following cases, attorneys convicted of felonies were disbarred: *In re Stroh, supra* (tampering with a witness); *In re Kerr*, 86 Wn.2d 655, 548 P.2d 297 (1976) (subornation of perjury); *In re Egger*, 86 Wn.2d 596, 547 P.2d 864 (1976) (robbery); *In re Krogh*, 85 Wn.2d 462, 536 P.2d 578 (1975) (conspiracy); *In re Johnson*, 74 Wn.2d 21, 442 P.2d 948 (1968) (grand larceny); *In re Anderson*, 73 Wn.2d 587, 439 P.2d 981 (1968) (grand larceny); *In re Caffrey*, 71 Wn.2d 554, 429 P.2d 880 (1967) (subornation of perjury); *In re Hett*, 70 Wn.2d 435, 423 P.2d 629 (1967) (aiding and abetting escape); *In re Wallis*, 63 Wn.2d 833, 389 P.2d 421 (1964) (grand larceny); *In re Dalton*, 60 Wn.2d 726, 375 P.2d 258 (1962) (grand larceny); *In re Timothy*, 58 Wn.2d 153, 361 P.2d 642 (1961) (grand larceny); *In re Ward*, 54 Wn.2d 593, 343 P.2d 872 (1959) (embezzlement); *In re Seijas*, 52 Wn.2d 1, 318 P.2d 961 (1957) (filing fraudulent income tax return); *In re Dillard*, 48 Wn.2d 376, 293 P.2d 761 (1956) (misappropriation of funds); *In re King*, 42 Wn.2d 617, 257 P.2d 219 (1953) (embezzlement); *In re Evers*, 41 Wn.2d 942, 247 P.2d 890 (1952) (grand larceny); *In re Durham*, 41 Wn.2d 609, 251 P.2d 169 (1952) (running house of prostitution); *In re Bixby*, 31 Wn.2d 620, 198 P.2d 672 (1948) (subornation of perjury); *In re Kennedy*, 21 Wn.2d 921, 151 P.2d 614 (1944) (forgery); *In re Liliopoulos*, 175 Wash. 338, 27 P.2d 691 (1933) (grand larceny); *In re Finch*, 156 Wash. 609, 287 P. 677 (1930) (illegal sale of liquor); *In re Sellers*, 142 Wash. 562, 253 P. 1119 (1927) (forgery); *In re Comyns*, 132 Wash. 391, 232 P. 269 (1925) (mail fraud); *In re Wells*, 121 Wash. 68, 208 P. 25 (1922) (conspiracy); *In re Mills*, 104 Wash. 278, 176 P. 556 (1918) (extortion); *In re Hopkins*, 54 Wash. 569, 103 P. 805 (1909) (improper use of notary seal); *State ex rel. Mackintosh v. Rossman*, 53 Wash. 1, 101 P. 357 (1909) (barratry). The above cases can be divided into two general categories: (1) crimes of moral turpitude demonstrating that the attorney is unfit for the trust and confidence reposed in him as an

attorney; and (2) crimes of moral turpitude demonstrating a calculated and flagrant disregard for the law. The crime involved here, assault in the second degree, falls into neither category.

Nothing in the crime of assault in the second degree can be said to impugn attorney McGrath's honesty and integrity or his skills as a lawyer. And the facts of this case demonstrate anything but a calculated and flagrant disregard for the law. Granted, Thomas McGrath's decision to carry a weapon into a drinking establishment was not a wise thing to do, as can be seen from the results of this case. Nevertheless, Mr. McGrath was not the initial aggressor. He attempted to avoid the confrontation by remaining at the bar until after closing hours and leaving by way of the rear exit. When he went outside, he received a hostile reception from the victim and his friend. As the two men approached Mr. McGrath, apparently with the intent of doing him bodily harm, he reacted in self-defense. Unfortunately, he answered their threats of force with potentially deadly force. The shooting was the almost inevitable result of one carrying a gun, legally or illegally, under such circumstances. While there is no doubt his conduct was violative of our criminal laws, I submit Thomas McGrath reacted to a dangerous situation as most individuals who carry guns would—he immediately reached for his gun. His reaction was an instinctive response to what he believed to be a threatening situation, not a carefully considered act of criminal violence. Such conduct, I believe, is clearly distinguishable from the type of conduct previously warranting disbarment.

Although Thomas McGrath's conduct may have involved moral turpitude, the facts indicate to me that this was an isolated instance that will not be repeated. Disbarment will serve no purpose in deterring McGrath or other attorneys from reacting similarly under such dangerous circumstances. Nor will disbarment protect the public from an unscrupulous and dishonest lawyer, for Thomas McGrath is neither. In short, to borrow the words of Justice Rosellini:

There appears to be no relation between the act of discipline and the evil which is attempted to be prevented. It seems to be a blind desire to obtain a pound of flesh for a wrong committed. It gives credence to the line found in Oliver Twist: "If the law supposes that," said Mr. Bumble ". . . the law is a ass—a idiot."

*In re Greiner,* 61 Wn.2d 306, 318, 378 P.2d 456 (1963) (Rosellini, J., dissenting).

## II
### ATTORNEY DISCIPLINE IS PUNISHMENT

The majority opinion reiterates the oft repeated words that the two basic purposes of attorney discipline are to protect the public from future misconduct of an attorney and to preserve public confidence in the legal profession. Majority opinion, at 344. *See In re McNerthney,* 95 Wn.2d 38, 41, 621 P.2d 731 (1980); *In re Zderic,* 92 Wn.2d 777, 787, 600 P.2d 1297 (1979). In nearly every attorney discipline case, we seem to mouth those words like some magical incantation which, if repeated often enough, will somehow solve all our problems. I can no longer subscribe to the idea that disciplinary sanctions are imposed solely to protect the public and preserve confidence in the legal profession. Those purposes, while certainly admirable, are only two of the many concerns we must address in attorney discipline cases. By grounding its decision to disbar Thomas McGrath on the need to preserve the "dignity of the court and . . . the reputation of the profession", majority opinion, at 346, the majority creates the mistaken impression that we are more concerned with public appearances than individualized fairness. To achieve a balanced approach to attorney discipline cases, I believe we must reexamine our basic purposes in imposing disciplinary measures.

Although this court has repeatedly denied that punishment is the basis for imposing disciplinary sanctions, *see In re Brown,* 97 Wn.2d 273, 275, 644 P.2d 669 (1982); *In re Purvis,* 51 Wn.2d 206, 223, 316 P.2d 1081 (1957), I fully agree with Justice Dolliver's conclusion that punishment is the motivating factor in attorney discipline cases.

Although the court is loath to say so, it is punishment in the sense of penalty that provides the real engine for lawyer discipline. The moral sensibilities of the bar—and perhaps the public—have been outraged. There has been a violation and an appropriate punishment will be meted out to the offender. *Once the court forthrightly faces up to the punishment function of bar discipline and does not disguise it under a variety of high–sounding and self–serving phrases, I believe it will be able to administer discipline more logically.*

(Italics mine.) *In re Rosellini,* 97 Wn.2d 373, 381, 646 P.2d 122 (1982) (Dolliver, J., dissenting). *See also In re Saulnier,* 97 Wn.2d 676, 678–80, 648 P.2d 433 (1982) (Dolliver, J., dissenting).

Punishment in the area of attorney discipline is not imposed simply to exact a penalty for a wrong committed. Instead, punishment is directed to achieve other important purposes. The proper measure of punishment works not only to protect the public from incompetent attorneys and to preserve public confidence in the profession—the two purposes most often cited for attorney discipline. Punishment also permits consideration of the deterrent effect of the sanction in preventing future misconduct as well as whether the attorney can be rehabilitated. While we have occasionally recognized these and other additional purposes in the past, our application of these principles to the cases has been inconsistent at best. I believe our recognition of attorney disciplinary sanctions as "punishment" will allow us to achieve the positive results we seek in not just some, but in all cases.

The concept of punishment encompasses not only the two traditional purposes given by this court for attorney discipline, but also a number of other factors often utilized by us in determining the appropriate disciplinary sanctions. For example, in the case of *In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974), we set forth five factors to be considered in determining the proper measure of discipline: (1) the seriousness and circumstances of the offense; (2) avoidance of repetition; (3) deterrent effect upon others; (4)

maintenance of respect for the honor and dignity of the legal profession; and (5) assurance that those seeking legal services will be insulated from unprofessional conduct. In the case of *In re Salvesen,* 94 Wn.2d 73, 76–79, 614 P.2d 1264 (1980), we enumerated a number of aggravating or mitigating factors to be considered in setting the appropriate sanction, including: (1) the attorney's background and legal career, (2) whether clients have suffered injuries, (3) the degree of cooperation with the bar in its investigation, (4) the attorney's acknowledgment of wrongdoing, and (5) the effect of allegations of wrongdoing on the attorney's reputation in the community. The above factors are all considerations also made in the field of criminal law in setting the appropriate punishment. Concerns for the public safety, deterrent effect of the penalty, likelihood of repetition, and the probability of rehabilitation are all common factors courts consider in setting punishment. Punishment is what we impose in attorney discipline cases and *punishment* is what we should call it.

Since our position as the final arbiters of attorney discipline is akin to that of a sentencing judge, it is necessary to establish some guidelines for the exercise of our broad powers in setting the appropriate punishment. Although punishment must be tailored to fit the circumstances of each particular case, *see In re Egger,* 86 Wn.2d 596, 547 P.2d 864 (1976), whenever possible we should strive for some semblance of uniformity in results. Our decision to fit the punishment to the wrong, therefore, should not be viewed as foreclosing our ability to treat like cases alike. Further, I believe we should reserve our harshest punishment—disbarment—for those wrongs we find most offensive. Otherwise, I think this severest of sanctions loses its effect as this court's ultimate statement of outrage at attorney misconduct. To achieve these results, I would suggest the following approach.

First, if the attorney's offense involves the conviction for a crime of moral turpitude, or if the conduct involves dishonesty or some activity touching upon the individual's

ability to practice law, I suggest that we presume some punishment short of disbarment will suffice until shown otherwise. My impression of our current approach is that we presume disbarment is the appropriate sanction unless sufficient mitigating factors are shown. Such an approach is far too harsh and causes unfair results. We should not forget the severe immediate and long–term effects a term of suspension can have on an attorney's law practice.[1] A term of suspension, with its attendant pecuniary loss and the loss of an attorney's good standing with the public and fellow attorneys, often will be punishment enough. Therefore, I would choose some lesser sanction, say a 1–year suspension, and then determine if there are sufficient mitigating factors to reduce the term of suspension or sufficient aggravating factors to increase the length of suspension or even warrant disbarment. While giving us some flexibility in

---

[1]It is worthwhile to consider the severe impact even a short term of suspension can have on an attorney's practice. During the term of suspension, the attorney cannot accept any new retainer or act as an attorney in any case or legal matter of any nature. DRA 6.7(c). The suspended attorney must notify all clients he or she is representing in pending matters that an order of suspension has been entered and that the suspended attorney will be unable to act as an attorney during that suspension. In addition, the suspended attorney must notify attorneys representing adverse parties in any pending litigation or administrative proceeding that he or she has been suspended. DRA 6.7(a) and (b). A notice of suspension will be published in both the Washington State Bar News and a newspaper of general circulation in the county in which the suspended attorney practices. DRA 6.7(e). Further, a copy of the notice of suspension will be sent to the presiding judge of the superior court in the county in which the disciplined attorney maintains a practice. DRA 6.7(f).

Beyond the above procedural matters, the practical effects of a term of suspension are obvious. Certainly, a suspended attorney will be denied income from his or her practice during the suspension which will likely represent a significant pecuniary loss. Depending on the nature and extent of the practice, this pecuniary loss may far exceed any fine that could be imposed by the criminal courts. Many clients may lose confidence and trust in the attorney and seek legal representation elsewhere. The attorney's staff, faced with the prospect of no work or income during the term of suspension, may be unwilling to await the attorney's reinstatement and may well seek employment in another office. Finally, and perhaps most importantly, a term of suspension will have a significant impact on the disciplined attorney's future relationships with fellow attorneys—the source of much new referral business. These adverse effects on an attorney's professional reputation, moreover, will last far beyond the term of suspension.

establishing the severity of the punishment, such an approach would be strong enough to punish the wrongdoer and still preserve the public's confidence in the bench and bar.

Second, as to conduct neither criminal nor having a direct impact on the attorney's ability to practice law, this court should dispense sanctions only when necessary and only to the degree necessary to protect the public and deter any reoccurrence. While I agree that we can and should expect a somewhat higher standard of conduct from members of the bar, we should also recognize that lawyers, too, are prone to human mistakes. The public recognizes this fact, I think, and expects only that some punishment be imposed commensurate with the offense. If misconduct reoccurs, harsher sanctions would then be in order.

Third, in determining the proper disciplinary sanctions to impose, we should take into account the nature and severity of the punishment imposed by the criminal courts, if any. When an attorney engages in conduct that would otherwise constitute a crime but, for whatever reason, no criminal action is commenced, our sanctions may need to be stronger to adequately punish the offender. If the criminal courts have dealt with the attorney's conduct by imposing criminal penalties, however, a lesser disciplinary measure may be needed to adequately punish that individual. The punishment aspect of attorney discipline should work in conjunction with or as a substitute for criminal laws. I think the imposition of a second severe punishment, without first considering the punishment already exacted, undermines the principles of fairness and proportionality embodied in our criminal law and in our attorney discipline cases.

Finally, we should permit ourselves the luxury of comparing the punishment to be imposed with punishments imposed in similar cases in the past. Such an approach should add some degree of predictability and uniformity to the results of our disciplinary cases.

## III
## APPROPRIATE PUNISHMENT

Having demonstrated that attorney discipline is actually punishment, I think the following analysis sets forth the appropriate punishment for attorney Thomas McGrath, Jr.

Since Mr. McGrath was convicted of the crime of assault in the second degree, even though that crime is wholly unrelated to his ability to practice law, I would begin by assuming a 1–year suspension is adequate to punish Mr. McGrath and yet maintain the integrity of the judiciary and respect for the profession. At that point, I would consider the aggravating and mitigating factors set forth in *Smith* and *Salvesen*.

In the way of aggravating circumstances, I must conclude the nature of the crime was very serious. When Thomas McGrath shot his victim, he inflicted severe injuries that required a good deal of medical attention, along with the attendant expenses of such treatment. Attorney McGrath placed himself in danger of inappropriately using his weapon when he carried his pistol into the bar and consumed too much alcohol. The amount of force used by Mr. McGrath to repel the forthcoming attack was, of course, excessive under the circumstances. The conviction of this attorney for a felony crime brings some degree of shame and disrepute upon the legal profession. The nature of the crime and the amount of force used would dictate to me that some punishment greater than a 1–year suspension may be in order.

In terms of mitigating factors, I would conclude Mr. McGrath's conduct was a temporary aberration that will not reoccur. The shooting was spontaneous and apparently not preconceived. Mr. McGrath's decision to plead guilty and cooperate with the Bar Association Disciplinary Board's investigation indicates to me a recognition of his wrongdoing and an attempt to rehabilitate himself. As a criminal penalty, attorney McGrath received a sentence of 10 years' probation. The conditions of that probation require that he serve a term in the county jail, make resti-

tution to his victim, and pay $14,668.91 to the crime victims compensation fund. Each of these things he has done. Further, the terms of his probation require him to abstain from alcohol and, as a convicted felon, he can no longer carry a firearm. Therefore, the likelihood of reoccurrence is slight since a violation of probation could subject Mr. McGrath to serving the remainder of his 10–year maximum sentence in jail.

Another factor which would merit leniency is the overwhelming support Thomas McGrath continues to enjoy from people in the community. The record is replete with letters of support for Mr. McGrath written by numerous attorneys, clients, relatives, and friends. His fellow professionals, to a person, praised his abilities as a lawyer. His clients expressed their confidence in his ability and noted that they would be willing to have him handle their legal work despite this incident. In reviewing these letters, one cannot escape the impression that Thomas McGrath, except for this one incident, is a competent, hardworking attorney.

Finally, although this may not always be a valid consideration, it should be noted that this attorney's conduct also constituted a tort. Without the ability to continue working as an attorney, it seems unlikely that Thomas McGrath will be able to make his victim whole should a judgment be rendered against him. Although McGrath's disbarment may enhance the reputation of the bar, it certainly will not aid his victim's ability to recover just compensation, which I am sure most victims would prefer.

The nature of the crime committed by attorney McGrath is serious and would seem to justify a stiffer penalty than a 1–year suspension. Nevertheless, there are enough mitigating factors here for me to conclude a punishment short of disbarment, in conjunction with the criminal sanctions already imposed, will achieve the intended results of protecting the public, deterring future misconduct, and preserving the public's confidence in the bench and bar. Accordingly, I would suspend Thomas McGrath from the

358

practice of law for a period of 2 years, with credit for the time he has already served under suspension. This would make him eligible for reinstatement on December 10, 1982. As a further condition, I would require attorney McGrath to maintain his continuing legal educational requirements during his suspension so as to insure his continuing competence as an attorney upon his reinstatement to the practice of law. Such a punishment, I believe, will adequately demonstrate our disapproval of Thomas McGrath's conduct and maintain our usual concerns for the public's interest.

UTTER and DOLLIVER, JJ., concur with WILLIAMS, J.

Reconsideration denied February 18, 1983.